UNITED STATES of America, Appellee,

v.

**Paul PADILLA and Juan Torres, Defendants–Appellants,**

**Luis Medina and Rosa A. Arias, Defendants.**

**Nos. 781, 863, Dockets 91–1501, 91–1531.**

United States Court of Appeals, Second Circuit.

Argued Jan. 30, 1992.

Decided April 6, 1992.

argument conveniently overlooks this boomer-       ang effect.

Marjorie M. Smith (The Legal Aid Society, Federal Defender Services Appeals Unit, New York City), for appellant Torres.

Vivian Shevitz (Georgia J. Hinde, of counsel, New York City), for appellant Padilla.

Jonathan S. Sack, Asst. U.S. Atty. (Andrew J. Maloney, U.S. Atty, Susan Corkery, Asst. U.S. Atty, E.D.N.Y.), for appellee.

Before: VAN GRAAFEILAND, WALKER, and McLAUGHLIN, Circuit Judges.

WALKER, Circuit Judge:

Juan Torres and Paul Padilla appeal from convictions entered by Judge Carol Amon, following a jury trial in the District Court of the Eastern District of New York on August 2, 1991 and August 9, 1991 respectively. Padilla was convicted of conspiring and attempting to possess cocaine with intent to distribute it, in violation of 21 U.S.C. § 846. Padilla also was convicted of three counts of assaulting federal officers in violation of 18 U.S.C. § 111. The district court sentenced Padilla to a prison term of 100 months, to be followed by four years of supervised release, and a $50 special assessment on each of the five counts. Torres was convicted of aiding and abetting an attempted possession of cocaine with intent to distribute it as well as one count of assaulting a federal officer. The district court sentenced Torres to a prison term of 60 months to be followed by four years of supervised release, and a $50 special assessment on each of the two counts. This appeal followed.

*Background*

At trial, the government asserted that Padilla and Torres were relatively minor participants in a cocaine importing and distributing conspiracy headed by Susan Torres Padilla, a/k/a "Rachel", who is Padilla's mother and Torres' sister. Specifically, the two were charged for their role in picking up a drug courier, Rosa Arias, at LaGuardia airport.

Central to the government's case was the testimony of the courier, Arias, and her boyfriend, Medina, who accompanied Padilla and Torres in a van sent by Rachel to pick up Arias. Arias described two smuggling trips to Bolivia that she made on behalf of Rachel's organization. The first trip, in April–May 1990, went off without a hitch. Arias, and a friend, Lottie, flew to Bolivia with Rachel's money. The two returned to New York a few weeks later carrying packages of cocaine strapped around their waists. Arias testified to Padilla's intimate involvement in this first trip. She stated that Padilla dropped her off and picked her up at the airport and that on both occasions, they discussed the purpose of her trip. Arias also testified that Padilla participated in the arrangements for Arias to make a second trip to Bolivia.

The second trip, in August–September 1990, was less successful. Arias flew to Bolivia on August 24. After meeting with Rachel's supplier, she flew back on September 6, 1990 with a brown paper package of cocaine taped to her body. As Arias proceeded through customs at the airport in Miami, she was stopped by an inspector who asked her if she was carrying any drugs. She admitted that she was and gave the package to the inspector. He determined that it contained 2,025 grams of cocaine and placed Arias under arrest.

At this point, Arias agreed to make a controlled delivery of the drugs in New York. At the request of the agents in

Miami, Arias attempted to call Rachel to arrange for Rachel to meet her at the airport on a later flight. She first called Medina to get Rachel's telephone number. He said he did not know the number, but would go over to Rachel's apartment and relay the message. When Medina did so, Rachel responded, in the presence of Torres and Medina: "What is she crazy? She knows DEA is all over the place, they have dogs." Thereafter, Rachel, Padilla, and Torres followed Medina to the gas station where he worked, left Medina there, and continued on to the airport to meet Arias.

When the three arrived at the airport, they were unable to find Arias. Frustrated, they returned to Medina's gas station. When they arrived there, Medina was talking on the phone to Arias, who, accompanied by two Drug Enforcement Agency (DEA) agents, had just arrived at LaGuardia airport. Rachel then sent Medina, Padilla, and Torres back to the airport to pick up Arias.

When Medina, Padilla, and Torres arrived at the airport, the DEA agents staked out their van and sent Arias over to make the controlled delivery. As soon as Arias entered the van, three agents rushed toward the van, guns drawn, and attempted to arrest Medina, who was outside the van, and Padilla and Torres, who were inside it. At that point, Padilla was in the driver's seat, and Torres was in the passenger's seat, sitting sideways, with his legs extending out the open passenger door.

While the precise contours of what happened next are not entirely clear, it seems that, as the agents closed in, Padilla put the van in gear and pulled away rapidly. The van thereupon struck one of the agents in the shoulder. The van next sideswiped a parked car, causing the passenger door to slam shut, nearly crushing another agent who was reaching for Torres. The slamming door pinned the agent's upper body inside the van. As the van continued forward, the trapped agent lost his footing, and his legs were dragged along the roadway. A third agent was forced to dive out of the way of the van and was struck by the door as the van sped past. The escape attempt was foiled when the agent pinned in the van managed to shoot Padilla in the foot. At that point, the van stopped and the agents arrested Padilla, Medina, and Torres.

## Discussion

On appeal, Torres asserts that the evidence presented at trial was insufficient to support his aiding and abetting conviction. Padilla contends that the district court erred in calculating his sentence. We affirm the district court in all respects.

### 1. Torres

In order to establish an aiding and abetting charge, the government must show that the defendant "knew of the proposed crime" and "joined the specific venture and shared in it, and that his efforts contributed to its success." *United States v. Labat*, 905 F.2d 18, 23 (2d Cir.1990). Torres claims that the evidence at trial failed to establish either element of the crime.

In reviewing a challenge to the sufficiency of evidence, this court must affirm a conviction if, after viewing the evidence in the light most favorable to the government and drawing all inferences in favor of the government, we conclude that *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *see Labat*, 905 F.2d at 22.

Here, we conclude that a reasonable fact finder could have found that Torres both knew of the underlying crime and took steps to contribute to its success. The government's theory was that Torres was at the airport to serve as a lookout. While the government did not present direct evidence that Torres knew that the purpose of the trip was to pick up a drug courier, "[t]he jury may base its verdict entirely on inferences from circumstantial evidence". *United States v. Oguns*, 921 F.2d 442, 449 (2d Cir.1990). The government presented ample circumstantial evidence to support the jury's conclusion that Torres knew that

Arias was carrying cocaine, and that Torres sought to further the cocaine conspiracy.

First, Medina testified that he informed Rachel that Arias was in Miami and would be delayed. Medina stated that upon receiving this news, Rachel became concerned that Arias might be apprehended in Miami, exclaiming "What is she crazy? She knows DEA is all over the place, they have dogs." Medina testified that Torres was in the room at the time of this conversation. It was reasonable for the jury to conclude that Torres heard the conversation. While this conversation did not expressly mention drugs, it did include references to the DEA and the presence of dogs at the airport. From this, a jury could reasonably infer that Torres knew the person at the airport would be carrying drugs.

■ Of course, "mere negative acquiescence ... in the criminal conduct of others, even with guilty knowledge is not sufficient to establish aiding and abetting. An aider and abettor must have some interest in the criminal venture." *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977). However, here the jury reasonably could have found that Torres' behavior, both at the airport and in deciding to go on the trip, established his interest in the venture. The agents testified that at the airport, Torres sat sideways in the front seat of the van, with his legs out the door, scanning the area. While Torres' behavior might plausibly have been viewed as innocent, once the jury determined that Torres knew that the courier would be carrying drugs, it was not unreasonable for the jury to conclude that Torres was acting as a lookout. *See id.* This conclusion is particularly sensible in light of the fact that Torres admitted that he did not know what Arias looked like. Thus, it is hard to see why Torres would have been "scanning the area" if not to spot potential interference with the drug transaction.

Further, the testimony showed that Torres made not one, but two trips to the airport. The jury could reasonably have concluded that if Torres wanted simply to keep Padilla company for a while, he would

not have taken the second trip. In addition, the jury could have concluded that Rachel would not have included her brother on the mission to pick up Arias if he were unknowing, lest he find out the truth and interfere. Finally, one of the arresting agents testified that when he entered the van, Torres pushed him. For this shove, Torres was convicted of assaulting a federal officer. Torres does not challenge this conviction. A jury could reasonably have found that this resistance indicated that Torres knew he was involved in some sort of wrongdoing. *See, e.g., United States v. Malizia*, 503 F.2d 578, 582–83 (2d Cir.1974) (flight may be considered evidence of guilt), *cert. denied*, 420 U.S. 912, 95 S.Ct. 834, 42 L.Ed.2d 843 (1975).

In sum, there was evidence from which the jury could conclude (1) that Torres was aware he was involved in wrongdoing, (2) that Torres knew Arias was carrying drugs, and (3) that Torres acted as a lookout. This evidence is sufficient to support the jury's determination that Torres was guilty of aiding and abetting the attempt to possess cocaine. Accordingly, we affirm his conviction.

2. Padilla

■ The jury found Padilla guilty of conspiring and attempting to possess cocaine, as well as assaulting the three government agents. Padilla does not challenge these convictions. Instead, he raises a host of objections to his sentencing.

Padilla's principal contention is that the district court selected the wrong Guidelines section in calculating his sentence on the assault counts. Judge Amon selected § 2A2.2, which applies to aggravated assault. Padilla argues that § 2A2.4, which applies to obstructing or impeding officers, was the correct one since it was the crime charged in the indictment.

The starting place for our analysis is the Guidelines themselves. Guidelines section 1B1.2(a) instructs the district court to "[d]etermine the offense guideline section ... most applicable to the offense of conviction (i.e., the offense conduct charged in the count of the indictment or information

of which the defendant was convicted)." The first step is to "locat[e] the offense of conviction in the Statutory Index." *United States v. McCall*, 915 F.2d 811, 814 (2d Cir.1990). For convictions under 18 U.S.C. § 111, the statutory index refers the district court to both sections 2A2.2 and 2A2.4. The district court chose § 2A2.2 on the ground that the conduct proven at trial established that Padilla had committed "a felonious assault that involved ... a dangerous weapon with intent to do bodily harm." U.S.S.G. § 2A2.2 (application note 1).

Padilla can not seriously dispute that his conduct, as proved at trial, fit the definition of aggravated assault in § 2A2.2. There was sufficient evidence for Judge Amon to conclude that Padilla had attempted to hit three DEA agents with a van as those agents tried to arrest Padilla. Judge Amon's conclusions that Padilla had the requisite intent to do bodily harm and that the van was a dangerous weapon were not clearly erroneous. *United States v. Garcia*, 936 F.2d 648, 656 (2d Cir.), *cert. denied*, ── U.S. ──, 112 S.Ct. 595, 116 L.Ed.2d 619 (1991); *United States v. Shoulberg*, 895 F.2d 882, 884 (2d Cir.1990).

Padilla contends, however, that our decision in *United States v. McCall*, 915 F.2d 811 (2d Cir.1990), requires the district court to select the applicable Guidelines section based only on the conduct charged in the count of the indictment on which the defendant was convicted. Since the relevant counts of the indictment did not allege that Padilla had intended to injure the agents, Padilla contends that under *McCall*, the district court was foreclosed from selecting § 2A2.2. We disagree.

■ Judge Amon acknowledged our holding in *McCall*, but reasoned that *McCall* did not change the end result since a cross reference provision under § 2A2.4 required the district court to consider underlying conduct. Section 2A2.4(c) provides as follows:

(c) Cross Reference

(1) If the defendant is convicted under 18 U.S.C. § 111 and the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault).

The district court concluded that the word "conduct" in § 2A2.4(c) means "actual conduct" rather than "charged conduct." Accordingly, the district court determined that § 2A2.2 (by way of § 2A2.4) was the most appropriate guideline.

We agree with Judge Amon's analysis. It is true that *McCall* requires the district court to consider only conduct charged in the indictment in making the initial selection of Guidelines sections. Once the district court chose section 2A2.4 initially, however, *McCall* ceased to be relevant. At that point, the district court properly considered the implications of Section 2A2.4(c)(1). Section 2A2.4(c)(1) is a cross reference provision. Guidelines section 1B1.3 instructs that, unless otherwise specified, cross references "shall be determined" on the basis of "all acts and omissions committed ... by the defendant ... that occurred during the commission of the offense of conviction." Accordingly, the Guidelines expressly authorize the course taken here by the district court. Judge Amon acted properly in following this clear dictate.

We acknowledge that there is some tension between our decision here and that in *McCall*, since *McCall* also involved a cross reference provision. However, there are several important differences between the Guideline at issue in *McCall* and the one at issue here.

In *McCall*, the defendant pled guilty to "a one-count information charging him with committing violent crimes in aid of racketeering activity" in violation of 18 U.S.C. § 1959. *McCall*, 915 F.2d at 814. Section 1959 is a blanket provision that applies to a wide range of crimes committed for pay or "for the purpose of gaining entrance to, or maintaining or increasing position in" a criminal enterprise. § 1959(a). The statute sets sentencing maximums ranging from life, where the underlying crime is murder or kidnapping, § 1959(a)(1), down to three years "for attempting or conspiring to commit a crime involving maiming, assault with a dangerous weapon, or assault resulting in serious bodily injury." § 1959(a)(6).

The statutory index lists guidelines section 2E1.3 as the most applicable guideline for convictions under § 1959. In keeping with the wide range of crimes punishable under section 1959, § 2E1.3 directs the court to apply either offense level 12 or "the offense level applicable to the underlying crime or racketeering activity," whichever is greater. U.S.S.G. § 2E1.3.

Thus, no matter what the underlying crime on which the § 1959 charge is based, the district court will always have to find the guidelines section appropriate to that crime in order to determine the proper base offense level. Section 2E1.3 merely provides that in no event may the base offense level fall below 12. Since § 2E1.3 does not finally answer the question of what is the most applicable guideline section, we determined in *McCall* that "underlying crime," as used in § 2E1.3, meant "underlying crime charged in the information". *McCall*, 915 F.2d at 814. Any other result would have conflicted with the command of § 1B1.2 to base selection of the most applicable Guidelines section on the conduct charged in the relevant section of the underlying indictment.

In contrast, § 2A2.4 is generally an endpoint. The cross reference provision of § 2A2.4 only applies where specific aggravating circumstances in addition to those required to establish a violation of § 111 exist. Far from being integral to the selection of the initial guideline, the cross reference section is designed to allow enhanced sentencing where the conduct proven is more severe than that alleged in the underlying indictment. Accordingly, in applying the cross reference section of § 2A2.4, § 1B1.2 does not come into play. Instead, § 1B1.3, which governs adjustments once the appropriate Guideline has been selected, controls. Under § 1B1.3, the district court must consider actual conduct. Since that is what Judge Amon did, we uphold her decision to sentence Padilla pursuant to § 2A2.2.

Padilla also contends that even if the cross reference to § 2A2.2 was appropriate, it was error for the district court to make a two point "official victim" enhancement under U.S.S.G. § 3A1.2. He asserts this is impermissible double counting, since the offense of conviction required the government to prove that Padilla assaulted a government official. *See* 18 U.S.C. § 111. This argument fails on two counts.

First, the guideline, unlike the statute, requires that the defendant know that he is assaulting an official victim. § 3A1.2(b). Thus, the guideline enhances for an additional factor that will not be present in every conviction under § 111.

Moreover, the Guidelines clearly contemplate an official victim adjustment under § 2A2.2. Application Note 1 to § 2A2.4 instructs the court not to "apply § 3A1.2 (Official Victim) unless subsection (c) requires the offense level to be determined under § 2A2.2 (Aggravated Assault)." Here, as noted above, subsection (c) does require that the offense level be determined under § 2A2.2. Accordingly, we think it clear that the district court correctly concluded that an official victim enhancement was appropriate. *See United States v. Sanchez*, 914 F.2d 1355, 1362 (9th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1626, 113 L.Ed.2d 723 (1991).

*Conclusion*

We have considered the remainder of defendants' claims and find them to be without merit. Accordingly, we affirm the judgment of the district court in all respects.