04-2643-cr (Lead), 04-3200 (XAP)
USA v. Salim

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2007

(Argued: May 13, 2008                    Decided: December 2, 2008)

Docket No. 04-2643-cr

----------------------------------------------------x

UNITED STATES OF AMERICA,

　　　　Appellee-Cross-Appellant,

-- v. --

MAMDOUH MAHMUD SALIM,

　　　　Defendant-Appellant-Cross-Appellee.

----------------------------------------------------x

B e f o r e :  NEWMAN, WALKER, and SOTOMAYOR, Circuit Judges.

Appeal by Defendant Mamdouh Salim from a 32-year sentence, entered in the United States District Court for the Southern District of New York (Deborah A. Batts, Judge), following a guilty plea to conspiracy to murder and attempted murder of a federal official in violation of 18 U.S.C. §§ 1114 and 1117. The United States cross-appeals on the ground that the district court erroneously refused to apply the terrorism sentencing enhancement of section 3A1.4 of the United States Sentencing Guidelines on the basis that the offense conduct did not transcend national boundaries.

VACATED and REMANDED.

RICHARD LIND, New York, N.Y., for Defendant-Appellant-Cross-Appellee.

JONATHAN S. KOLODNER, Assistant United States Attorney, of counsel, (Celeste L. Koeleveld, Assistant United States Attorney, of counsel, on the brief), for Michael J. Garcia, United States Attorney for the Southern District of New York, New York, N.Y., for Appellee-Cross-Appellant.

JOHN M. WALKER, JR., Circuit Judge:

Defendant-Appellant Mamdouh Mahmud Salim ("Salim") appeals from the 32-year sentence imposed in the Southern District of New York (Deborah A. Batts, Judge) following his guilty plea to conspiracy to murder and attempted murder of a federal official in violation of 18 U.S.C. §§ 1114 and 1117.  Salim contends that the district court erroneously applied several sentence enhancements under the United States Sentencing Guidelines ("U.S.S.G."), including the enhancements for "Obstructing or Impeding the Administration of Justice," U.S.S.G. § 3C1.1, for an "Official Victim," U.S.S.G. § 3A1.2, and for "Restraint of Victim," U.S.S.G. § 3A1.3.  On cross-appeal, the United States contends that the district court erred in failing to apply the "Terrorism" enhancement of U.S.S.G. § 3A1.4, on the basis that the offense conduct did not transcend national boundaries.  Because we reject Salim's claims but agree with the government that the terrorism enhancement does not require such

-2-

transnational conduct, we remand with directions to the district court to vacate the sentence and resentence.

**BACKGROUND**

In 1999, Salim and others were indicted in the Southern District of New York on charges related to the 1998 U.S. Embassy bombings in Kenya and Tanzania. The case was assigned to Judge Leonard Sand and Salim was housed in the maximum security wing of the Metropolitan Correctional Center (MCC).

On November 1, 2000, Salim stabbed corrections officer Louis Pepe in the eye with a sharpened comb. The charges arising from this attack were ultimately severed from the underlying proceedings before Judge Sand, and, on April 3, 2002, Salim pleaded guilty to conspiring and attempting to murder officer Pepe in violation of 18 U.S.C. §§ 1114 and 1117 before Judge Deborah Batts.

At the ten-day Fatico hearing, see generally United States v. Fatico, 579 F.2d 707 (2d Cir. 1978), the government presented the testimony of seven witnesses, several pieces of forensic evidence, and crime scene photographs to support its theory that Salim and "unspecified others" had concocted and acted upon an elaborate but ultimately fruitless plan to escape the MCC by taking hostages.

Inmates at the MCC were rotated between cells every 21 days. On October 25, 2000 (six days before the attack) Salim was moved

-3-

from Cell One to Cell Six of Unit 10-South, where his cellmate was Khalfan Mohamed, a co-defendant in the embassy bombings case.

In a pre-hearing submission, Salim contended that he attacked Pepe in an attempt to escape, not to take hostages. During the Fatico hearing, however, Salim's story changed. On direct examination, Salim testified that during the summer of 1999, he had planned to escape the MCC with Mohamed Odeh, another codefendant, but ultimately decided that the escape plan could not work and abandoned it. Instead, Salim claimed, he attacked Pepe to get his keys, unlock a visitation room on 10-South, and attack his attorneys so that they would withdraw from representing him and Judge Sand would have to grant substitute counsel.

Salim claimed that he had grown increasingly frustrated with counsel's performance and had written a letter to Judge Sand on February 22, 2000 requesting substitute counsel. Judge Sand held a hearing and denied the request, telling Salim that it was up to him to solve his problems with his attorneys.

Salim wrote Judge Sand again on September 23 requesting substitute counsel, and on October 2 thanking him for listening to his problems and requesting a hearing before another judge. Judge Sand referred the matter to Magistrate Judge Eaton, who held a hearing on October 26, at which Salim (according to his testimony at the Fatico hearing) insulted his attorneys and asked

"Are they waiting until I physically assault them? I didn't say physically, but I said assault." In a letter dated October 27, defendant expressed concern that he would not receive substitute counsel and that he hadn't been given "enough time to express [his] problem with the lawyers."

On October 30, Salim said he received a letter from Magistrate Judge Eaton informing him of "his decision in writing, not only verbally, that he will not allow attorney change." He then concluded that he "only had one recourse, to attack [his lawyers] physically, and in that instance they will be resigning." He complained to his cellmate Mohamed, who agreed to help Salim assault his lawyers, in part to atone for his "sin" of testifying in a way that led to Salim's imprisonment.

On November 1, according to Salim's testimony, Salim was awakened by Pepe, who informed him that his lawyers were in one of 10-South's visitation rooms. Pepe took Salim to the visiting room. He usually met with his lawyers face-to-face, but because Salim said he needed to use the computer, he ended up separated from his attorneys by a screen. Salim then said he needed to get some more material from his cell. As Pepe escorted him to his cell, Salim began singing, which was a prearranged signal to Mohamed to ready himself for the attack. On arriving in Cell Six, Mohamed grabbed Pepe's walkie-talkie, and Salim struck

Pepe's legs from behind and sprayed hot sauce in his eyes.[1]  With Pepe on the floor, Salim attempted to turn him over to get his keys.  Salim says he then "became crazy" and stabbed Pepe in the eye with his sharpened comb-knife.  The weapon penetrated the corrections officer's eye and entered his brain.  Salim then locked Pepe in the cell and started back to the visitation room, at which point other corrections officers arrived and subdued him.

On September 25, 2003, the district court, in a lengthy opinion, rejected the government's theory that Salim's assault on Pepe was motivated by a hostage-taking/escape plan.  United States v. Salim ("Salim I"), 287 F. Supp. 2d 250, 300-01 (S.D.N.Y. 2003).  The district court concluded that Salim's plan was to attack his attorneys and thereby force Judge Sand to grant his substitution motion.  As a result, the district court determined that the attack on Officer Pepe was designed "to influence or affect by intimidation or coercion Judge Sand's decision whether or not to substitute Defendant's counsel and also was calculated to retaliate against judicial recommendations and orders denying Defendant's applications for substitute counsel."  Id. at 304.  The district court observed that Salim's numerous requests for substitution were denied, showing that

---

[1]    A commissary request from October 26, the date of Salim's hearing before Magistrate Judge Eaton, showed that Salim requested five bottles of hot sauce and received two on that day.

Salim knew Judge Sand "had ultimate authority to replace" his attorneys. Id. at 303.

The district court also found that Salim's alternative explanation, that he only wanted to force the attorneys to resign, and was unconcerned with Judge Sand's actions, was "incredible," as "[d]efendant clearly did not believe his attorneys could unilaterally withdraw or resign from his case." Id. at 304.

In calculating Salim's Guidelines sentence, the district court found, inter alia, that a three-level enhancement applied under U.S.S.G. § 3A1.2(a) (the Official Victim enhancement) because "Defendant attacked Officer Pepe while Pepe was performing his official duties," and a two-level enhancement under U.S.S.G. § 3A1.3 (the Restraint enhancement) because "Pepe was physically restrained during the attack." Id. at 308-09.

The district court declined to apply the terrorism enhancement of U.S.S.G. § 3A1.4, which incorporates the term "Federal crime of terrorism" defined in 18 U.S.C. § 2332b(g). In so holding, the district court's decision culminated in the following conclusions:

> From the plain text of 18 U.S.C. § 2332b, the following is clear: 1.) Section 2332b(g), which inter alia, sets forth a definition for "Federal crime of terrorism," explicitly directs this definition to be construed "As used in this section;" 2.) Section 2332b(f), wherein the term "Federal crime of terrorism" is used, vests the Attorney General with authority to investigate Federal crimes of terrorism, with such authority being "in addition" to that already available

-7-

under Title 18; 3.) the Attorney General already has broad authority to investigate crimes under Title 18; 4.) Section 2332b is entitled and addresses "Acts of terrorism transcending national boundaries" (emphasis added); and 5.) Section 2332b(g)(1) recites that "conduct transcending national boundaries" means conduct occurring outside of the United States in addition to the conduct occurring in the United States. From the foregoing, it is apparent that a "Federal crime of terrorism" is one that meets the requirements at § 2332b(g)(5) and involves "conduct transcending national boundaries."

Id. at 339.  Because Salim's assault on Officer Pepe did not meet the latter requirement, the district court held that the terrorism enhancement did not apply.  Id. at 354.

The district court initially declined to impose an "obstruction of justice" enhancement under U.S.S.G. § 3C1.1 based on inconsistencies between Salim's testimony at the Fatico hearing and his pre-hearing submissions to the court.  Id. at 315.  On reconsideration, however, the court granted the government's motion for this enhancement based on a different theory, concluding that "Defendant testified untruthfully under oath about a material fact with the specific intent to impede or obstruct justice."  Order at 7, United States v. Salim ("Obstruction Order"), No. 01-cr-002 (S.D.N.Y. Apr. 7, 2004).

After applying the relevant enhancements, the district court calculated Salim's guidelines range at 262-327 months imprisonment.  It then applied an upward departure under U.S.S.G. § 5K2 and imposed a 32-year sentence.  On a Crosby remand, see United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the

-8-

district court decided not to resentence. Salim filed the instant appeal claiming the district court improperly enhanced his sentence, and the government cross-appealed the district court's decision not to apply the terrorism enhancement.

**DISCUSSION**

We review a district court's imposition of sentence under "an abuse-of-discretion standard." Gall v. United States, 128 S. Ct. 586, 597 (2007). "The abuse-of-discretion standard incorporates de novo review of questions of law (including interpretation of the Guidelines) and clear-error review of questions of fact." United States v. Legros, 529 F.3d 470, 474 (2d Cir. 2008). "[I]mproperly calculating" the applicable "Guidelines range" constitutes a "significant procedural error" warranting remand for resentencing under this standard. See Gall, 128 S. Ct. at 597.

Salim argues that the district court improperly calculated the applicable Guidelines range by erroneously applying the obstruction of justice, official victim, and restraint of victim enhancements. The government argues that the district court erred by refusing to apply the terrorism enhancement on the basis that a "Federal crime of terrorism" must involve transnational conduct. We address each argument in turn.

**I. The Obstruction of Justice Enhancement**

"[T]o base a § 3C1.1 enhancement [for "Obstructing or

Impeding the Administration of Justice"] upon the giving of perjured testimony, a sentencing court must find that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." United States v. Zagari, 111 F.3d 307, 329 (2d Cir. 1997). The district court found that Salim willfully gave perjured testimony at the Fatico hearing regarding his motive for his scheme to assault his lawyers. Specifically, Salim falsely claimed "that he did not intend to affect Judge Sand's determination" to grant substitute counsel, and stated that he only wanted to force his lawyers to resign of their own volition. See Obstruction Order at 6.

**A. Material and False Statements**

Salim first contends that his motive for attempting to attack his lawyers was not material because he only pleaded guilty to attacking Pepe and not to any offense based on his alleged plan to assault his lawyers.

This argument relies on an impermissibly narrow notion of materiality. "'Material,'" for the purposes of the obstruction enhancement, "means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1 n.6 (emphasis added). The issue under determination was whether the terrorism enhancement applied, i.e., whether the attempted murder of Pepe

-10-

was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5). In short, the district court had to determine the purpose of Salim's attack. See Salim I, 287 F. Supp. 2d at 290 ("The purpose of the Fatico hearing was to adduce facts sufficient to establish Defendant's intent in attacking Officer Pepe on November 1, 2000.").

Absent Salim's statements, the district court could have concluded, for example, that the assault on Pepe was an isolated incident, fueled by anger at Magistrate Judge Eaton's recent adverse recommendation and Judge Sand's prior refusal to substitute counsel. Testimony that the assault was part of a larger plan and statements alleging a credible motive for such a plan would, if believed, undoubtedly make the district court less likely to draw this conclusion, and therefore less likely to conclude that Salim attacked Pepe in retaliation for government conduct (a motive warranting application of the terrorism enhancement). They are therefore material.

As to the element of falsity, the district court found that

> Defendant's testimony that he believed substitution of counsel would have occurred but for "the lawyers themselves" is incredible. Defendant clearly did not believe his attorneys could unilaterally withdraw or resign from his case-Defendant sent letters to Judge Sand, requesting substitution of counsel . . . and Defendant repeatedly interrupted proceedings in 98-CR-1023 [the embassy bombings proceeding] to address his requests to substitute counsel to Judge Sand.

-11-

Salim I, 287 F. Supp. 2d at 304. These conclusions represent findings of fact on the falsity of Salim's statements. Thus, we can only reverse them if they are clearly erroneous. United States v. Agudelo, 414 F.3d 345, 348 (2d Cir. 2005).

Salim contends that his testimony at the Fatico hearing was consistent, rather than "evasive and contradictory," Obstruction Order at 7. We disagree. The record supports the district court's characterization of falsity: Salim knew that Judge Sand had the authority to change his lawyers but had denied Salim's request to do so, and that Judge Eaton had recommended denying Salim's most recent request. However, Salim denied believing that the judge would have no choice but to appoint new lawyers if Salim attacked them. Moreover, Salim testified that he planned to attack his lawyers in order to obtain substitute counsel, but, during re-direct, he stated that he would never have attacked his lawyers in a hostage-taking scheme because "[i]n Islam it is not permissible for me to attack any lawyer as long as he represents me." Faced with such conflicting indicia of motive and belief, it would not be clearly erroneous for the district court to conclude that, for example, Salim made a false statement when he stated his belief that Judge Sand "had no problem giving me other lawyers, but the problem was the lawyers themselves, they didn't want to resign." Salim I, 287 F. Supp. 2d at 287.

In his reply brief, Salim argues that his testimony on the issue of attorney substitution or withdrawal was certainly plausible in light of both "the chronology of court proceedings in the Embassy Bombing case," and an examination of a court transcript containing language by Judge Sand that if remedial attempts by the court to ameliorate the relationship between Salim and his attorneys was not working, the court would consider whether new counsel should be appointed. Appellant's Reply Br. at 8. Even if we accept this contention, it would not establish clear error. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. Bessemer City, 470 U.S. 564, 574 (1985). Accordingly, this argument fails.

**B. Guidelines Section 3C1.1 and "blatant perjury"**

Citing United States v. Williams, 79 F.3d 334 (2d Cir. 1996), and United States v. Catano-Alzate, 62 F.3d 41 (2d Cir. 1995), Salim contends that this court will not uphold an obstruction enhancement "where a district court made no findings that the allegedly false statement constituted blatant perjury." Appellant's Br. at 64. Neither case supports this argument.

Williams and Catano-Alzate both interpret United States v. Dunnigan, 507 U.S. 87, 95 (1993), in which the Supreme Court advised that, when imposing the obstruction enhancement, "it is preferable for a district court to address each element of the

-13-

alleged perjury in a separate and clear finding." The sentences in Williams, 79 F.3d at 337, and Catano-Alzate, 62 F.3d at 42, were vacated because the district court failed to make specific findings as to the elements of the enhancement.

Here, by contrast, the district court issued a written order citing Dunnigan and explicitly finding that Salim's statements were "false," and "made intentionally." Obstruction Order at 5-6. It also found that the statements, "[i]f believed[,] . . . would have impacted the Court's analysis of whether Defendant intended to influence or affect Judge Sand's decision . . . the very basis for the Court's finding" as to the terrorism enhancement. Id. This language, which largely tracks the definition of "material" used in § 3C1.1 n.6, plainly constitutes a "separate and clear finding" of the materiality element under Dunnigan. See 507 U.S. at 95. Finally, having found all of the elements of perjury, the district court went on to find that the perjury was committed "in an attempt to obstruct justice." Obstruction Order at 7. The district court plainly found all of the elements of § 3C1.1 by a preponderance of the evidence, and nothing in Dunnigan, Williams, or Catano-Alzate requires more.

**C.  Intent to Obstruct Justice**

The district court found that Salim's "false statements were provided in an attempt to obstruct justice." Obstruction Order at 7. This finding was not clear error. First, as noted

-14-

above, we credit the district court's characterization of Salim's statements as evasive and contradictory. Second, the district court found, in its earlier order following the Fatico hearing, that Salim's attack was motivated, in part, by a desire to retaliate against Magistrate Judge Eaton's recent adverse recommendation regarding Salim's efforts to obtain substitute counsel. Salim I, 287 F. Supp. 2d at 304. If this finding is correct, Salim's failure to mention this desire when asked to describe his motive strongly suggests that his false testimony was made with the specific intent to obstruct justice.

Salim argues that the district court's finding as to his retaliatory motive was erroneous because he did not receive notice of Judge Sand's latest denial of his motion until nine days after he attacked Pepe. However, the district court's finding was that the attack "also was calculated to retaliate against judicial recommendations and orders denying Defendant's applications for substitute counsel." Id. (emphasis added). This finding plainly refers to Judge Sand's previous denials and Magistrate Judge Eaton's adverse recommendation, and not just to Judge Sand's October 31 denial. Because Salim knew of the former orders and recommendation, his alleged ignorance as to the latter order does not render the finding of retaliatory motive clearly erroneous. As a result, there was no clear error in the district court's resultant conclusion that Salim testified with an intent to obstruct justice.

The fact that the district court applied a theory of the terrorism enhancement different from the one urged by the government does not alter our calculus. As suggested above, supra Part I.A, the issue at the Fatico hearing was whether the enhancement covered Salim's conduct, not whether the government's theory that Salim was attempting to take hostages to escape the MCC was correct. Accordingly, the district court's finding, in support of the obstruction of justice enhancement, that Salim willfully made false statements was not clearly erroneous.

**II. The Official Victim Enhancement**

The district court granted a three-level upward enhancement under U.S.S.G. § 3A1.2(a) because Salim's victim was a government officer and Salim's offense "was motivated by Officer Pepe's official status." Salim I, 287 F. Supp. 2d at 307.

Salim first cites United States v. Goolsby, 209 F.3d 1079, 1081 (8th Cir. 2000), where a defendant, awaiting sentencing for a drug conviction, assaulted a federal corrections officer during an escape attempt. The Eighth Circuit held that the enhancement could not be applied to the drug conviction because the officer was not a victim of the drug offense. Id. at 1082. Goolsby is readily distinguishable, however, because the underlying offense here is attempted murder of a federal officer, and Pepe is plainly the victim of this offense.

Next, Salim asserts that there was no proof that his offense was motivated by Pepe's official status.  But Salim's testimony showed both knowledge of Pepe's status and an assault committed to obtain a key that Pepe possessed only as a result of this status.  Given this evidence, the district court's finding that the assault was motivated by the victim's official status was not clear error.  See United States v. Bailey, 961 F.2d 180, 182 (11th Cir. 1992) (finding that robbery was motivated by official status when "defendant robbed the postmistress because, as a postal employee, she was in possession of money orders and a money order validation machine").

Finally, Salim argues that this enhancement should not apply to an offense that specifically incorporates an officer's status. In United States v. Padilla, 961 F.2d 322, 327 (2d Cir. 1992), we rejected a similar argument with respect to 18 U.S.C. § 111, which proscribes the assault of a federal officer, because the enhancement, unlike the underlying statute of conviction, required knowledge of the victim's status.  Salim's statute of conviction, 18 U.S.C. § 1114, while incorporating the victim's official status as an element, does not require proof that the motivation for the attack was the victim's status.  Thus, applying the enhancement here does not involve "impermissible double counting" because "the guideline enhances for an additional factor that will not be present in every conviction"

-17-

under the statute.  Padilla, 961 F.2d at 327.

**III.  The Restraint of Victim Enhancement**

The district court granted a two-level upward enhancement under U.S.S.G. § 3A1.3 because Officer Pepe was physically restrained in the course of the offense.  Salim I, 387 F. Supp. 2d at 310.  Salim argues that any restraint of Pepe after he was disabled by the stabbing did not add to the basic crime.  We disagree.  By pleading to attempted murder, Salim admitted that he stabbed Pepe with murderous intent.  Handcuffing a victim and locking him in a cell after a potentially lethal attack prevents a victim from seeking aid and thereby adds to the underlying offense of attempted murder.  See United States v. Rosario, 7 F.3d 319, 321 (2d Cir. 1993) (finding that restraint facilitated, rather than constituted, the offense of conviction when "the victim could do nothing about [his] situation because of the physical restraint" (alteration in original) (internal quotation marks omitted)).

**IV.  The Terrorism Enhancement**

Section 3A1.4 of the Sentencing Guidelines provides that "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism," the offense level will be increased by 12 levels (and be no lower than level 32) and defendant's criminal history category shall be Category VI. U.S.S.G. § 3A1.4.  The commentary to that section provides that

-18-

"'federal crime of terrorism' has the meaning given that term in 18 U.S.C. [§] 2332b(g)(5)." Id. n.1.

In turn, 18 U.S.C. § 2332b(g)(5) provides that

> the term "Federal crime of terrorism" means an offense that–
> (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and
> (B) is a violation of [certain enumerated sections, including 18 U.S.C. § 1114].

In its sentencing opinion, the district court found "that Defendant's attack on Officer Pepe was in furtherance of his intent to affect or influence Judge Sand's decision about substitution of counsel, and was in retaliation for judicial conduct denying Defendant's applications for substitution of counsel," Salim I, 287 F. Supp. 2d at 303, and rejected Salim's claim that there was no evidence of these facts on the record. Id. at 323. It also noted that "Defendant was convicted of an offense enumerated at 18 U.S.C. § 2332b(g)(5)(B)." Id.

Despite its finding that Salim's offense met both elements of the § 2332b(g)(5) definition, the district court nonetheless refused to apply the terrorism enhancement because it discerned a third requirement. The district court held that "it is apparent that a 'Federal crime of terrorism' is one that meets the requirements at § 2332b(g)(5) and involves 'conduct transcending national boundaries.'" Id. at 339 (emphasis added) (quoting 18 U.S.C. § 2332b(a)(1)). Because Salim's offense did not satisfy

-19-

this third requirement, the district court concluded that the terrorism enhancement was inapplicable.

The district court opined that "[t]his definition of a 'Federal crime of terrorism'" incorporating a "transnational conduct" element "reconciles the textual directives of the different subsections of 18 U.S.C. § 2332b, as well as the specific and broad context in which the term 'Federal crime of terrorism' occurs." Id. We disagree, and conclude that the district court's interpretation is irreconcilable with the text of both subsection (g)(5) in particular and section 2332b as a whole.

Apart from its appearance in subsection (g), which defines the terms used elsewhere in section 2332b, the term "Federal crime of terrorism" is used only once in the statute. Section 2332b(f) provides in relevant part:

> In addition to any other investigative authority with respect to violations of this title, the Attorney General shall have primary investigative responsibility for all Federal crimes of terrorism, . . . , and the Secretary of the Treasury shall assist the Attorney General at the request of the Attorney General.

18 U.S.C. § 2332b(f) (emphasis added).

The district court concluded that, unless a "Federal crime of terrorism" only referred to crimes involving transnational conduct, subsection (f) would be meaningless because other sections of Title 18 already give the Attorney General "broad

-20-

authority to investigate violations" of that Title.  Salim I, 287 F. Supp. 2d at 338.  Thus, in order for subsection (f) to convey authority "[i]n addition to" the Attorney General's existing authority, "the extended authority must be in areas not before authorized."  Id.  Because the Attorney General already had investigative authority over purely intra-national offenses under Title 18, this section could not convey any additional authority (despite its obvious intent to do so) unless Federal crimes of terrorism covered only crimes involving conduct transcending national boundaries.

This argument cannot be reconciled with the statutory text of subsection (g)(5), in which a transnational conduct requirement is nowhere to be found.  The district court erred in deriving such a requirement from its reading of subsection (f).  Subsection (f) does not give the Attorney General additional "authority" to investigate Federal crimes of terrorism, it gives that officer "primary investigative responsibility" for such crimes.  18 U.S.C. § 2332b(f) (emphasis added).  Whatever the exact meaning of "primary investigative responsibility," it is plainly distinct from "investigative authority" because it envisions an authority expressly superior to that possessed by another actor.  It is not meaningless to give an executive officer primary investigative responsibility over a certain category of crimes, even if he has pre-existing authority to investigate the same crimes.

Prior to the passage of section 2332b, we presume, both the Attorney General and the Secretary of the Treasury had certain "investigative authority" with respect to violations of Title 18. See, e.g., 18 U.S.C. § 1030(d)(1) (giving the Secret Service, a division of the Treasury Department, authority to investigate offenses involving computer fraud). When subsection (f) became effective, the Attorney General was given primary investigative responsibility with respect to certain Title 18 crimes (specifically, those offenses that constituted Federal crimes of terrorism) over the Secretary of the Treasury. The district court overlooked the fact that one official's authority may be enhanced by making it superior to that of another official, and not just by increasing the number of crimes to which it extends. As a result, subsection (f) is coherent on its face, and thus undercuts any perceived need to read an extra-textual "transnational conduct" element into the definition of Federal crimes of terrorism.

The district court also asserted that its transnational conduct element "harmonizes" the definition of Federal crime of terrorism with the focus of section 2332b as a whole, "which is 'Acts of terrorism transcending national boundaries.'" Salim I, 387 F. Supp. 2d at 339 (quoting the title of 18 U.S.C. § 2332b). We recognize that the offenses punished by section 2332b are those "involving conduct transcending national boundaries," 18

-22-

U.S.C. § 2332b(a)(1), but Salim was not charged with or convicted of violating that statute. Our focus is only on subsection 2332b(g)(5), the particular subsection of section 2332b that the Sentencing Commission cross-referenced in the commentary to U.S.S.G. § 3A1.4. The sentencing enhancement for a federal crime of terrorism is not limited to conduct that constitutes an offense under section 2332b; it applies to any conduct that meets the definition of subsection (g)(5). Congress could have defined "Federal crime of terrorism" to include a requirement that the offense conduct transcend national boundaries, but it did not. Instead, it defined two distinct terms, "Federal crime of terrorism" and "conduct transcending national boundaries," and neither term references the other. 18 U.S.C. § 2332b(g)(1),(5). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: the judicial inquiry is complete." <u>Conn. Nat'l Bank v. Germain</u>, 503 U.S. 249, 253-54 (1992) (internal citations and quotation marks omitted).[2] Our refusal to incorporate a transnational conduct element in the definition of "Federal crime

---

[2] For this reason, Salim's rule of lenity argument also fails. <u>See</u> <u>United States v. Canales</u>, 91 F.3d 363, 367-68 (2d Cir. 1996) ("The rule is inapplicable unless after a court has seized on every thing from which aid can be derived, it is still left with an amiguity." (internal quotation marks and alterations omitted)).

of terrorism" accords with the judgment of our sister circuits. See United States v. Harris, 434 F.3d 767, 773 (5th Cir. 2005) ("The definition of a 'federal crime of terrorism' . . . encompasses many offenses, none of which has an element requiring conduct transcending national boundaries."); United States v. Hale, 448 F.3d 971, 988 n.1 (7th Cir. 2006); see also United States v. Dowell, 430 F.3d 1100, 1105, 1110-12 (10th Cir. 2005) (assuming without deciding that the terrorism enhancement applied to domestic terrorist acts involving the destruction of an IRS office in Colorado Springs); United States v. Graham, 275 F.3d 490, 496, 513-19 (6th Cir. 2001) (applying the "domestic terrorism enhancement" to conduct by domestic militia that was "planning to attack government targets on an unspecified future date").

Salim contends that the district court's refusal to apply the enhancement was correct for a separate reason: the rulings of a judge do not constitute "government conduct" under 18 U.S.C. § 2332b(g)(5)(A). This argument is patently meritless. As the district court properly observed, "it is hardly a novel construction . . . to conclude that the 'conduct of government' embraces" judicial rulings, such as the substitution of assigned counsel. Salim I, 287 F. Supp. 2d at 329. Salim cites no case reaching a contrary conclusion. If a federal judge is a "government official," United States v. Adelman, 168 F.3d 84, 86

-24-

(2d Cir. 1999), it follows that a magistrate judge's recommendations regarding, and a district judge's ruling on, requests to substitute counsel constitute "government conduct" for the purposes of 18 U.S.C. § 2332b(g)(5) and, by reference, U.S.S.G. § 3A1.4.

As we have noted, Salim also argues that while his planned attack on his lawyers may have been calculated to influence the conduct of government, his actual attack on Pepe was not. We reject this myopic view of the purpose of the attack. And even if it were correct, this argument provides no basis for upholding the district court's refusal to apply the enhancement, because of the district court's alternative finding: that the attack on Pepe was "calculated to retaliate against judicial recommendations and orders denying Defendant's applications for substitute counsel." Salim I, 287 F. Supp. 2d at 304. As noted previously, see supra Part I.C, Salim has failed to demonstrate that this finding, a second basis for applying the terrorism enhancement, was clearly erroneous.

Because the district court fell into legal error by holding that a Federal crime of terrorism must involve conduct transcending national boundaries, we conclude that the sentence imposed was unreasonable based on the procedural failure to calculate the appropriate Guidelines range. See Gall, 128 S. Ct. at 597. As a result, we need not reach the question of whether

-25-

the district court appropriately departed upward from the applicable Guidelines range under U.S.S.G. § 5K2.  We have considered the remaining arguments made by Salim and his counsel and find them to be without merit.

**CONCLUSION**

For the foregoing reasons, we REMAND to the district court with directions to VACATE Salim's sentence and resentence in accordance with this opinion.