08-5937-cv
Cameron v. City of New York

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2009

(Argued:    September 1, 2009                    Decided:    March 10, 2010)

Docket No. 08-5937-cv

_____

KAREN CAMERON, SYLVIA HIGGENBOTTOM,

*Plaintiffs-Appellants*,

‒ v. ‒

THE CITY OF NEW YORK, CARMEN RAMOS, ANGEL RIVERA, SERGEANT PETERSON, JOHN DOES, JANE DOES,

*Defendants-Appellees.*

_____

Before: CALABRESI, CABRANES, and HALL, *Circuit Judges*.

_____

Plaintiffs-Appellants Karen Cameron and Sylvia Higgenbottom appeal from an order granting judgment to Defendants-Appellees Carmen Ramos, Angel Rivera, and the City of New York following a jury verdict in Appellees' favor, in Appellants' suit for false arrest and malicious prosecution.  The United States District Court for the Southern District of New York (Paul A. Crotty, Judge) denied Appellants' post-trial motions for judgment as a matter of law or for a new trial.  Although we AFFIRM the denial of the motion for judgment as a matter of law, we VACATE and REMAND the case for a new trial in light of improper opinion testimony as to Appellees' credibility, as to whether Appellees possessed probable cause, and as to how various evidence should be interpreted.

_____

SCOTT A. KORENBAUM (Michael L. Spiegel, *of counsel*), New York, N.Y., *for Plaintiffs-Appellants*.

JANE L. GORDON, Senior Counsel (Edward F.X. Hart, *of counsel*), *for* Michael A. Cardozo, Corporation Counsel of the City of New York, New York, N.Y., *for Defendants-Appellees*.

_____

CALABRESI, *Circuit Judge*:

On July 2, 2005, Officers Carmen Ramos and Angel Rivera (along with the City of New York, "Appellees") arrested Karen Cameron and her mother, Sylvia Higgenbottom (together, "Appellants"), and charged Cameron with a variety of state law misdemeanors. According to Appellees, they did so because Cameron reached into their squad car, grabbed Ramos's shirt, and was otherwise disorderly, and because Higgenbottom interfered with their arrest of Cameron and was also disorderly. Appellants claim that they did no such things, and that Ramos and Rivera knowingly and maliciously fabricated a story to support the arrests of Cameron and Higgenbottom and the prosecution of Cameron. No criminal charges were filed against Higgenbottom, and, after a criminal trial in state court, Cameron was acquitted in full. Appellants subsequently sued in the District Court for the Southern District of New York (Crotty, *J.*), stating claims of false arrest, and in Cameron's case of malicious prosecution as well, against Ramos and Rivera, under both state law and 42 U.S.C. § 1983. Appellants also brought claims of *respondeat superior* liability and supervisory liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), against the City of New York.

After a week-long trial, a jury found for Appellees on all counts. That verdict cannot stand, however, because the jury was exposed to a significant amount of erroneously admitted and

highly prejudicial testimony. Two Assistant District Attorneys ("ADAs") and a police lieutenant were allowed to give their opinions on Ramos's and Rivera's credibility, on whether probable cause existed to arrest or charge the Appellants, and on whether certain evidence strengthened or weakened Appellants' case. The admission of these statements violated bedrock principles of evidence law that prohibit witnesses (a) from vouching for other witnesses, (b) from testifying in the form of legal conclusions, and (c) from interpreting evidence that jurors can equally well analyze on their own. These errors were not harmless, not least because they allowed ostensibly neutral government agents to speak directly to the two most hotly contested issues in this case: Ramos's and Rivera's credibility, and whether Ramos and Rivera had probable cause for their actions. Accordingly, we vacate the jury verdict and remand for a new trial.

Appellants raise three other issues, as well.

First, they argue that Appellees' account of events was squarely contradicted by a series of photographs taken by a security camera at the scene. Appellants claim that these unimpeached pictures so "blatantly contradict[]" Appellees' story that Appellees' version of facts could not be accepted by a reasonable jury, and that Appellants are therefore entitled to judgment as a matter of law. Appellants' Br. 31. We disagree. The photographs do not definitively rule out either side's version of events, and hence the District Court correctly denied Appellants' motion for judgment as a matter of law.

Appellants' other two claims concern the instructions given to the jury. They argue (a) that the District Court should have instructed the jury that, under New York law, the offense of "obstructing governmental administration," for which Higgenbottom was arrested, requires that the obstructed officers be engaged in a lawful arrest, and (b) that Appellants' version of events

3

would have allowed a jury to infer that Ramos and Rivera acted with malice, entitling them to a punitive damages instruction. Given that we are remanding for a new trial, we consider these arguments in the interest of judicial economy, and conclude that Appellants are correct on both counts. To the extent these issues recur at trial on remand, instructions similar to those that Appellants requested should therefore be given.

## BACKGROUND

**I.     Factual Allegations**

Because Appellants' evidentiary challenge requires us to review "everything . . . the jury considered on the issue in question," *Hynes v. Coughlin*, 79 F.3d 285, 291 (2d Cir. 1996) (internal quotation marks omitted), it is useful to lay out each side's case in some detail.

*A.     Appellants' Account of the Incident*

Cameron and Higgenbottom both testified at trial. According to them, on the morning of July 2, 2005, Higgenbottom, Cameron's mother, noticed that the right front wheel of Cameron's car was up on the sidewalk outside their apartment complex. She called Cameron to tell her this, then drove away to get her own car washed. Cameron left her apartment to see the car, then called 911 at 10:12 a.m. to request a police incident report. At 10:23 a.m., she called 911 again to find out when the police would arrive. When she saw Ramos and Rivera drive by and stop a block away at 10:25 a.m., she called 911 a third time, to tell the officers where she was. The officers then made a U-turn and parked behind Cameron's car.

Rivera left the police car and inspected Cameron's car. Cameron requested an incident report, and discussed what had happened to her vehicle. Rivera said he would find out if he could prepare an incident report, and went back to his police car. At this point, Higgenbottom returned, parked in front

4

of Cameron's car, and walked over to Cameron. The police car moved forward a few feet and Rivera rolled down the passenger-side window. Ramos was sitting in the passenger seat. Cameron walked over to the passenger-side window and leaned forward to discuss the possibility of getting an incident report. Her left hand was behind her back, holding two white shopping bags; she was gesturing with her right hand, but, Cameron alleges, her hand never entered the car or touched Ramos.

Ramos then yelled "get your hands off the car" twice and told Cameron that she was under arrest. Cameron responded by tossing her bags to the ground and putting her hands behind her back. She argued with the officers about the grounds for her arrest before submitting to handcuffing, and was placed in the police car. Rivera grabbed at her legs, so Cameron tried to "pull his hands off" her; she was then taken out of the police car for the handcuffs to be adjusted. Other than arguing about the grounds for arrest and trying to take Rivera's hands off her at that time, Cameron denies in any way resisting arrest.

Higgenbottom said that she heard Ramos say "get your hands off of the car" and saw Ramos and Rivera arrest Cameron. Higgenbottom then walked around the police car, and Rivera pushed her back; other than this, Higgenbottom denies any physical contact with either officer. Higgenbottom turned away from the arrest to go to her own car, get her cell phone, and call 911. When Higgenbottom returned with her cell phone, Ramos said "call your lawyer if you want to, call your lawyer" and "do you want to go with your girlfriend?" She then arrested Higgenbottom.

B.      *Appellees' Account of the Incident*

Ramos and Rivera also testified. They claimed that, when they arrived at the scene, Cameron was "upset" and "loud," "looked like a homeless person," and had "white stuff" or "dry saliva" around her lips. J.A. 202, 281-82. She did not request an incident report, but rather wanted to know what towing agency had put her car on the curb. When Cameron approached the window, Rivera told her

5

that he could fill out an incident report and asked for her license and registration, at which point "she lost it." J.A. 206. Rivera and Ramos testified that Cameron was gesturing with one or both hands inside the vehicle.[1] Ramos told Cameron twice to get her hands out of the car, at which point Cameron said "What, are you going to arrest me?" and grabbed Ramos's shirt. J.A. 325. Ramos and Rivera left the car to arrest Cameron, who was "struggling," "flailing her arms," and refusing to be handcuffed. J.A. 225. Cameron then opened the back door of the police car and jumped in; Ramos and Rivera did not at first notice this because they were distracted by Higgenbottom screaming "leave her alone, she is a DEA agent."[2] When they checked to see if Cameron was securely handcuffed, Cameron kicked, punched, and spat at the officers, who removed her from the car and re-handcuffed her.

According to Ramos and Rivera, Higgenbottom was yelling and screaming behind them during this time; Rivera "had to turn back to Ms. Higgenbottom over and over again to tell her to stand back," telling her this "about ten times." J.A. 233-35, 250-51. Otherwise, Ramos and Rivera testified, Higgenbottom made no contact with the officers and they did not have any verbal exchange with her before they arrested her.

C.    *Photographic Evidence*

A security camera recorded the incident from some distance, taking photographs at two-second intervals. In the photographs, Cameron can be seen leaning toward the window of the police car, with her left hand behind her back, holding two shopping bags. Her right hand cannot be seen. After six to ten seconds in this position, Cameron stands up, turns her body away from the police car, throws her bags on the sidewalk, and puts her hands behind her back. Ramos and Rivera get out of the vehicle

---

[1] In the online arrest form Rivera filled out, the subsequent complaint he signed, and at Cameron's criminal trial, Rivera testified that Cameron stuck both hands in the police car. At trial, however, he stated that she only put one hand in the vehicle. Ramos testified that Cameron rested her forearms on the car door, with both hands in the car.

[2] Cameron works as an investigative assistant for the DEA.

6

and approach Cameron. From this point on, it appears as though the officers are interacting with Cameron in some manner. Beyond this, it is difficult, if not impossible, to decipher from the photographic footage exactly what is happening. Higgenbottom appears to be standing near the officers until Cameron has entered the police car for the first time. At some point thereafter, Higgenbottom walks away from the police car, in the direction of her own car, and returns approximately twenty seconds later. She remains near the police car and can be seen standing near the officers for roughly thirty seconds after Cameron has apparently been put in the police car for a second time, after which the officers arrest Higgenbottom.

D.     *Post-Arrest Events*

Lieutenant Norman Peterson arrived on the scene after the arrests. He spoke with Ramos and Rivera, who told him what had occurred. Based on their information, he determined that Cameron and Higgenbottom were not eligible for summonses or desk appearance tickets, but would instead need full arrest processing. He spoke with Cameron, and found her to be "coherent" and "calm and polite." J.A. 341. He then took Cameron to the stationhouse, and another officer brought Higgenbottom.

Rivera also went to the stationhouse, where he completed the online booking process for Cameron and Higgenbottom. In his online arrest form, he charged Cameron with harrassment, N.Y. Penal Law § 240.26, disorderly conduct, *id.* § 240.20, and resisting arrest, *id.* § 205.30. He charged Higgenbottom with obstructing governmental administration, *id.* § 195.05, and disorderly conduct. Later that day, he met with ADA Elizabeth Brandon of the Bronx District Attorney's Office, who prepared a Criminal Court Complaint charging Cameron with those offenses as well as attempted assault in the third degree, N.Y. Penal Law §§ 110, 120.00. Based on Rivera's information, Brandon decided not to prosecute Higgenbottom because she did not think the State would be able to prove a case against her.

7

According to Brandon, all of the information in the criminal complaint that was filed came from Rivera. Brandon's name appears nowhere on the complaint; rather, it says that "PO ANGEL RIVERA . . . states that . . . THE DEFENDANT COMMITTED THE OFFENSES" charged. J.A. 617. It is only signed by Rivera. The complaint states that any false statements made therein are punishable as misdemeanors. The complaint also states that Rivera was "informed by PO RAMOS, CARMEN . . . that, as a result of [Cameron's] actions, PO Ramos experienced annoyance and alarm and fear for her physical safety." *Id.* Ramos subsequently signed a supporting deposition stating that this information was true.

The charges against Cameron were adjudicated in a bench trial prosecuted by then-ADA Irene Pangilinan. At the close of this criminal trial, the judge acquitted Cameron on all counts.

**II.      Testimony as to Existence of Probable Cause and Credibility of Ramos and Rivera**

At the trial of Appellants' subsequent civil suit, Appellees elicited testimony as to the credibility of Ramos and Rivera, as to whether they had probable cause to arrest and prosecute Cameron and Higgenbottom, and as to whether certain evidence strengthened or weakened Appellants' case. This testimony came through three witnesses: ADA Pangilinan, who was the trial prosecutor for Cameron's criminal trial; ADA Brandon, who prepared the complaint for Rivera; and Lieutenant Peterson, the superior officer who arrived at the scene of the incident after the arrests.

*A.      Pangilinan's Testimony*

Appellees called Pangilinan, who was an ADA from September 2004 until April 2008. She testified to the content and tone of Cameron's tape-recorded 911 calls, and to Cameron's appearance in her arrest booking photo, as neither the tape-recordings nor the photo were any longer available. She also testified that the 911 calls, the booking photo, and the time-lapse security camera photos all "corroborated" Ramos and Rivera's account, and that nothing on them led her to consider dropping the

8

prosecution. J.A. 504-05. Furthermore, she said, the surveillance photos "actually strengthened [Cameron's] prosecution." J.A. 504. Pangilinan also testified extensively about her communications with Rivera and Ramos. She testified that nothing Rivera or Ramos said led her to consider dropping the case; that she had no reason to believe anything they said was inaccurate; that they did not encourage her to continue the prosecution or have any role in trial strategy; and that she and her supervisors, rather than Rivera or Ramos, decided whether or not to continue Cameron's prosecution. Appellants objected to nearly every question in the relevant portions of Pangilinan's testimony.

B.    *Brandon's Testimony*

Appellants called Brandon, primarily to inquire about the procedure for filing a criminal complaint and to confirm certain ways that Rivera's and Ramos's accounts had changed since the day of the arrests. On cross examination, Brandon testified over objection that she decided whether or not to initiate proceedings against Cameron, and that she would not "have decided to prosecute Ms. Cameron if [she] did not believe there was probable cause to believe that [Cameron] had committed a crime."[3] J.A. 272.

C.    *Peterson's Testimony*

Appellants also called Peterson, primarily "to refute Ramos and Rivera's testimony concerning Ms. Cameron's allegedly disheveled appearance and strange behavior." Appellants' Br. 42. On cross, Appellees elicited testimony that, after speaking with Ramos and Rivera, Peterson thought that probable cause existed to arrest Cameron and had no "reason to doubt the officers' account of the facts that day." J.A. 353. (Appellants did not object to this testimony.) He also testified that he saw the security camera photos "[a] long time after" the arrest, and said over objection that they did not change

---

[3] While Appellants objected to Brandon's statement that she decided to initiate proceedings against Cameron, they did not object again a moment later when she stated that she would not have prosecuted without probable cause. Appellees do not, however, argue that Appellants waived any objection to that latter comment.

his opinion about the arrests. J.A. 359. Appellees also asked Peterson a second time if there was probable cause to arrest Cameron for the crimes she was charged with, but the District Court sustained Appellants' objection and the question went unanswered.

**III.    Jury Verdict and Appeal**

On September 29, 2008, the jury returned a verdict in favor of Appellees on all counts. The District Court subsequently denied Appellants' motions for judgment as a matter of law under Fed. R. Civ. P. 50 or for a new trial under Fed. R. Civ. P. 59, and entered judgment in favor of Appellees. Appellants filed a timely appeal.

On appeal, Appellants make four arguments. First, they argue that the security camera photos definitively establish that the events did not happen as Appellees describe them. Even though the photos were only taken every two seconds, Appellants contend that they still "blatantly contradicted" Ramos and Rivera's version of the incident, for the photos allegedly show that Cameron never put a hand through the police car's window. Because summary judgment is appropriate where "[i]ncontrovertible evidence . . . so utterly discredits the opposing party's version [of events] that no reasonable juror could fail to believe the version advanced by the moving party," *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007), Appellants argue, the District Court erred in denying their Rule 50 motion.

Second, they claim that the District Court abused its discretion in allowing Pangilinan, Brandon, and Peterson to testify (a) to Ramos's and Rivera's credibility, (b) to the declarants' belief that there was probable cause for the arrests and prosecution, and (c) to the consistency of documentary evidence with the parties' allegations. They argue that this testimony was irrelevant, improperly stated a legal conclusion, vouched for the officers' credibility, and improperly opined on the evidence before the jury. *See* Fed. R. Evid. 401, 403, 701. Additionally, they contend, Pangilinan

10

should not have been permitted to describe the contents of the arrest photographs and 911 calls, which were no longer available at the time of trial. *See* Fed. R. Evid. 403, 1002. Appellants also maintain that these errors were not harmless, as the Appellees' case was weak and the improper testimony went to the central issues of the case: probable cause and the credibility of Ramos and Rivera. In response, Appellees assert primarily that this testimony was relevant to Cameron's malicious prosecution claim, because it showed that the prosecutors "made independent decisions based on additional, corroborating evidence," Appellees' Br. 38; they also claim that all of the testimony was relevant to damages and, furthermore, that Peterson's testimony was relevant to Appellants' *Monell* claims.

Third, Appellants argue that the District Court erred in declining their request for an instruction that Higgenbottom's arrest for obstructing governmental administration could not have been lawful if Cameron's arrest was not lawful. Specifically, Appellants asked the District Court to instruct the jury that "[i]f . . . probable cause was lacking for Ms. Cameron's arrest, then defendants' actions were not authorized by law and [the jury's] verdict must be for Ms. Higgenbottom." J.A. 53. Instead, the District Court instructed the jury that the offense of obstructing governmental administration was committed by interfering with "an official function," without defining that term. J.A. 661.

Fourth, Appellants claim that the District Court erred in declining their request for a punitive damages instruction. During the charging conference, Appellants argued that their evidence supported a finding that Ramos and Rivera had intentionally lied, which Appellants claimed could constitute "intentional and malicious" or "wanton and reckless" conduct. J.A. 476-77. The District Court denied the request, stating that "while [Appellants] raise genuine issues of

11

material fact as to whether Officer Ramos and Rivera committed false arrest and initiated a malicious prosecution[, t]here is no evidence that their actions were wanton, malicious or reckless." J.A. 497.

**DISCUSSION**

**I.      Motion for Judgment as a Matter of Law**

We review the denial of a motion for judgment as a matter of law *de novo*, and will grant the motion only if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-movant] on that issue." Fed. R. Civ. P. 50(a)(1); *see also Olivier v. Robert L. Yeager Mental Health Ctr.*, 398 F.3d 183, 188 (2d Cir. 2005). We "must draw all reasonable inferences in favor of the nonmoving party, and . . . may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). But "[o]ur obligation to draw all reasonable inferences in favor of [the non-movant] does not mean we must credit a version of the facts that is belied by the record." *Tabbaa v. Chertoff*, 509 F.3d 89, 93 n.1 (2d Cir. 2007). Accordingly, we "give credence to . . . that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves*, 530 U.S. at 151 (internal quotation marks omitted). When a movant presents "[i]ncontrovertible evidence . . . such as a relevant videotape whose accuracy is unchallenged," we will grant the movant's motion for judgment as a matter of law if that evidence "so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party." *Zellner*, 494 F.3d at 371; *see also Scott v. Harris*, 550 U.S. 372, 380 (2007).

Appellants do not claim that anything in the trial testimony itself required a verdict in their favor. Instead, they argue that the security camera photos were "unimpeached evidence . . .

which a jury is 'required to believe,'" and that those photos "conclusively prove that Ms. Cameron *did not reach into the police car at all*." Appellants' Br. 28-29. In three consecutive photographs, Cameron is in an almost identical position, leaning forward at the passenger-side window of the police car. This is precisely the period of time during which Cameron allegedly reached into the police car, according to Ramos's and Rivera's testimony at trial. Ramos testified that Cameron reached into the car at the moment of the second picture in this series, while Rivera stated that he "guess[ed]" that Cameron reached in "more or less" in the four-second window comprised by the three pictures. J.A. 210, 327.[4] Because "Ms. Cameron's overall body position does not change from one photo to the next," Appellants contend, Appellees' version of events "defies reality and relies on sheer surmise and speculation concerning the brief time-lapse between each photo." Appellants' Br. 29-30. Indeed, they maintain, Appellees' version (which the jury accepted) "calls for suspension of belief in the laws of the physical universe." Appellants' Br. 30.

We disagree. The photographs are not nearly so conclusive as to render the jury's verdict unreasonable as a matter of law. The photographs are blurry and taken at some distance; it is impossible when viewing the photographs in sequence to tell definitively whether Cameron's right arm is visible between her body and the police car, or is instead at her side and blocked from view by her body. We cannot rule out the possibility that the photographs actually depicted Cameron with her hand inside the police car, let alone the possibility that she might have put her hands in the police car in between pictures. Certainly it seems unlikely that she did so, given the similarities in posture in the three pictures at issue, but the pictures do not rule out Appellees'

---

[4] After stating twice that Cameron reached in "more or less" during one of the two-second lapses between photographs in that four-second interval, Rivera stated more precisely that the reaching occurred in that time period. J.A. 210.

13

interpretation, as they would need to do to justify granting Appellants' motion. Moreover, the jury reasonably could have found that Cameron reached into the police car at the very end of the sequence, particularly given Rivera's testimony that the reaching occurred only "more or less" within the four-second interval. Cameron's posture changes dramatically between the third photograph that depicts her leaning toward the police car and the following photograph in which she has straightened up. It would therefore be a reasonable interpretation that Cameron might have reached into the police squad car at that time.

This is not to say that still photographs can never belie a party's interpretation of events so definitively that judgment as a matter of law is warranted. We hold only that *these* photographs, especially when viewed in light of the testimony and the record in this case, do not provide the level of certainty requisite to negate the jury's verdict.

**II.      Testimony of the Prosecutors and Lieutenant Peterson**

*A.      Standard of Review*

"We review a district court's evidentiary rulings for abuse of discretion, and will reverse only for manifest error." *Manley v. AmBase Corp.*, 337 F.3d 237, 247 (2d Cir. 2003) (citations omitted). We afford district courts "wide latitude . . . in determining whether evidence is admissible, and in controlling the mode and order of its presentation to promote the effective ascertainment of the truth." *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 119 (2d Cir. 2006) (citations and internal quotation marks omitted).

Even if we do find that evidentiary rulings were manifestly erroneous, we will not grant a new trial if we find that the improperly admitted evidence was "harmless—i.e., [that] the evidence was unimportant in relation to everything else the jury considered on the issue in question."

14

*United States v. Germosen*, 139 F.3d 120, 127 (2d Cir. 1998). An error is harmless if we "can conclude with fair assurance that the evidence did not substantially influence the jury." *United States v. Rea*, 958 F.2d 1206, 1220 (2d Cir. 1992). We consider several factors in determining whether evidentiary error warrants a new trial:

> In assessing the wrongly admitted testimony's importance, we consider such factors as whether the testimony bore on an issue that is plainly critical to the jury's decision, whether that testimony was material to the establishment of the critical fact or whether it was instead corroborated and cumulative, and whether the wrongly admitted evidence was emphasized in arguments to the jury.

*Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000) (citations and internal quotation marks omitted). We also consider "the overall strength of the [appellees'] case." *United States v. Al-Moayad*, 545 F.3d 139, 164 (2d Cir. 2008) (quotation marks omitted); *see also Wray*, 202 F.3d at 526 ("[T]he principal factors to be considered are the importance of the witness's wrongly admitted testimony, and the overall strength of the [appellees'] case.").

*B.    Applicable Rules of Evidence*

Under the Federal Rules of Evidence, relevant evidence—that is, evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable" is "generally admissible." Fed. R. Evid. 401, 402. This presumption of admissibility is subject to many exceptions, several of which are implicated in this case.

First, "[a]s a matter of law, the credibility of witnesses is exclusively for the determination by the jury, and witnesses may not opine as to the credibility of the testimony of other witnesses at the trial." *United States v. Forrester*, 60 F.3d 52, 63 (2d Cir. 1995) (internal quotation marks and brackets omitted); *see also United States v. Johnson*, 529 F.3d 493, 499 (2d Cir. 2008) ("It is

15

. . . impermissible for a government agent to vouch for a government witness or generally to opine on the credibility of witnesses." (citations omitted)). For example, it is typically improper for an investigating agent to "communicat[e] that he had skeptically and scrupulously checked out all the information furnished by the witnesses before accepting it." *Johnson*, 529 F.3d at 498. Similarly, we have found error where an expert witness "stated that he 'rejected' the possibility that [witnesses] had lied." *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005).

Second, witnesses may not "present testimony in the form of legal conclusions." *United States v. Articles of Banned Hazardous Substances Consisting of an Undetermined Number of Cans of Rainbow Foam Paint*, 34 F.3d 91, 96 (2d Cir. 1994); *accord Densberger v. United Techs. Corp.*, 297 F.3d 66, 74 (2d Cir. 2002).[5] Such testimony "undertakes to tell the jury what result to reach, and thus attempts to substitute the [witness's] judgment for the jury's." *Nimely*, 414 F.3d at 397 (internal quotation marks omitted). Hence, "the issue of whether or not probable cause to arrest exists is a legal determination that is not properly the subject of expert opinion testimony." *Rizzo v. Edison Inc.*, 419 F. Supp. 2d 338, 348 (W.D.N.Y. 2005), *aff'd* No. 05-3707, 172 Fed. App'x 391 (2d Cir. Mar. 24, 2006) (summary order). On the other hand, if a witness's *own belief* as to probable cause is relevant to the outcome of a case (for example, where a police officer is sued for false arrest, and claims that she believed she possessed probable cause to arrest), that witness's testimony about her own subjective belief may be admissible.

Third, a lay witness may testify in the form of an opinion, even one that goes to "an

---

[5] The cases laying out this rule have focused on *expert* witnesses. But the impropriety of allowing a *lay* witness to testify in the form of a legal conclusion is all the clearer. In any event, as the Advisory Committee stated in amending Rule 701 in 2000, "a [lay] witness' testimony must be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701 Advisory Committee's Note (2000).

16

ultimate issue to be decided by the trier of fact," but may do so only so long as that testimony is "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Fed. R. Evid. 701(b), 704(a). This "helpfulness requirement is designed to provide assurance[] against the admission of opinions which would merely tell the jury what result to reach" or would constitute an attempt "to introduce meaningless assertions which amount to little more than choosing up sides." *Rea*, 958 F.2d at 1215-16 (internal quotation marks omitted); *see also* Fed. R. Evid. 701 Advisory Committee's Note (1972). For example, when jurors can see with their own eyes both a defendant and a photograph that allegedly depicts that defendant, there is usually no need for a witness to testify to a resemblance between the two; but if a party alleges that a photograph depicts a person the jury has not seen, that testimony may be helpful in establishing the similarity. *See United States v. Robinson*, 544 F.2d 110, 113 (2d Cir. 1976).

Finally, all such testimony is subject to the general balancing rule of Rule 403, which provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403; *see generally, e.g.*, *United States v. Salameh*, 152 F.3d 88, 110 (2d Cir. 1998) (per curiam).

C.    *Application to the Instant Case*

Under these well-settled rules of evidence, much of the challenged testimony would quite obviously be inadmissible in the ordinary case. Appellees argue, however, that this case is different, because the elements of malicious prosecution claims render the challenged testimony admissible. In particular, Appellees claim that Pangilinan's and Brandon's testimony showed that prosecutors "made independent decisions based on additional, corroborating evidence," and that

17

Ramos and Rivera might therefore not "be considered to have 'caused' or 'procured' the prosecution, thus defeating grounds for liability." Appellees' Br. 38 (quoting *White v. Frank*, 855 F.2d 956, 962 (2d Cir. 1988)).[6]

This argument misunderstands the nature of the tort of malicious prosecution. Malicious prosecution occurs when "(1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice and, (4) the matter terminated in plaintiff's favor." *Ricciuti v. N.Y. City Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). Under New York law, police officers can "initiate" prosecution by filing charges or other accusatory instruments. *Id.*; *see also, e.g.*, *Murphy v. Lynn*, 118 F.3d 938, 944 (2d Cir. 1997) ("Under New York law, if there has been no indictment, a criminal action is commenced by the filing of an accusatory instrument, to wit, a 'felony complaint' for a felony charge, or a 'misdemeanor complaint' or an 'information' for a misdemeanor charge." (citations omitted)); *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 568, 571 (2d Cir. 1996) (finding "no dispute as to the first . . . element[]" where the plaintiff "was immediately taken to the police station and was charged" by the defendant officer).

As the District Court correctly instructed the jury, there was no dispute in this case as to the existence of the first and fourth prongs of Cameron's malicious prosecution claim. As a matter of law, Ramos and Rivera's filing of the Criminal Court Complaint "initiated" the prosecution against Cameron. *See Ricciuti*, 124 F.3d at 130. And, of course, Cameron's

---

[6] Appellees defend Peterson's testimony on a different ground, arguing that his role as Ramos's supervisor rendered his opinions as to probable cause and Ramos' credibility relevant to Appellants' *Monell* claim, because Peterson was Ramos and Rivera's supervisor. But Appellants' *Monell* claim does not concern how the City of New York responded to the incident in *this* case; it focuses instead on how the City had supervised and disciplined Ramos in the past. As a result, as discussed *infra* ___, while some of Peterson's testimony may have been relevant to the *Monell* claim, much of it was not.

18

acquittal in the criminal prosecution constituted a termination in her favor. Hence, the only questions that the jury had to decide with respect to the malicious prosecution claim were (a) whether *Ramos and Rivera* had probable cause to initiate the prosecution; (b) whether *Ramos and Rivera* initiated the proceeding with malice; and (c) what damages, if any, Cameron was entitled to.

Appellees suggest that the jury had another question to answer, on which the challenged testimony was relevant: whether the prosecutors' opinions and actions attenuated the officers' causal responsibility for the prosecution. But generally in malicious prosecution actions alleging that a police officer provided false information to a prosecutor, what prosecutors do subsequently has no effect whatsoever on the police officer's initial, potentially tortious behavior. *See Higazy v. Templeton*, 505 F.3d 161, 177 (2d Cir. 2007) ("[T]he chain of causation need not be considered broken if [a defendant government agent] deceived the subsequent decision maker or could reasonably foresee that his misconduct [would] contribute to an independent decision that results in a deprivation of liberty." (alteration in original) (citation and internal quotation marks omitted)); *Zahrey v. Coffey*, 221 F.3d 342, 352 (2d Cir. 2000) ("Even if the intervening decision-maker (such as a prosecutor, grand jury, or judge) is not misled or coerced, it is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty.").

Appellees rely on dicta suggesting that the "independent judgment" of a grand jury or public prosecutor might, in some circumstances, attenuate a complaining witness's role in "causing" or "procuring" a prosecution. *See White*, 855 F.2d at 962. This dicta merely acknowledges that a complaining *layperson* might not be responsible for a prosecution if

19

prosecutors go forward based on independent, untainted evidence. As a result, it would not appear that it has *any* application where a police officer is alleged to have maliciously misled a prosecutor. *See Higazy*, 505 F.3d at 177; *Zahrey*, 221 F.3d at 354 n.10 ("[A] police officer who fabricated evidence and forwarded that evidence to a prosecutor (who used it against a defendant) would [be] liable for the consequences of his misconduct . . . ."); *Llerando-Phipps v. City of New York*, 390 F. Supp. 2d 372, 383 (S.D.N.Y. 2005) ("[A]pplying the layperson standard to the police would mean that law enforcement officers would never be liable for malicious prosecution. . . . Although there is a presumption that a prosecutor exercises independent judgment in deciding whether to initiate and continue a criminal proceeding, an arresting officer may be held liable for malicious prosecution when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors." (internal quotation marks omitted)).

Moreover, the dicta has no application here, where the "independent judgment" consisted of no more than verifying some of the allegedly false information provided by the officers. The evidence about which Pangilinan testified—the security camera footage, the 911 calls, and the booking photos—could not on its own justify a prosecution, absent the information provided by Ramos and Rivera. Accordingly, the prosecutors' belief that the officers were credible, and that the photographs and 911 calls were consistent with the officers' version of events, could not have relieved the officers of causal responsibility. It follows that testimony as to that belief was not relevant to any element that Appellants needed to prove.

Additionally, to the extent that a prosecutor's decision to continue a prosecution does represent an acceptance of a police officer's version of events, the character of that implicit vouching is far different from that of the testimony admitted in this case. It is one thing for a jury

to infer that a prosecutor took a case to trial because she thought there was a basis for the case. It is another thing entirely for a prosecutor to state that she believed that photographs in evidence "corroborated the events . . . recounted by the police officers, and . . . actually strengthened [the] prosecution," J.A. 504, a belief, significantly, that the prosecutor would not be permitted to state at the underlying criminal trial. And it is another thing again for a prosecutor to state that she had no "reason to believe that anything [the complaining officers told her] was not accurate," J.A. 505. Such a statement goes well beyond the details of the officers' account and necessarily represents support for their general character for honesty.

Furthermore, Appellees' theory misunderstands the function of a screening prosecutor in relation to a malicious prosecution claim. The prosecutor's actions do not supersede the complaining officer's actions; they only determine whether the officer's actions come to fruition—that is, whether the officer committed the tort of malicious prosecution, or merely *attempted* to prosecute maliciously. Notably, in this case, Brandon decided not to prosecute Higgenbottom; that decision is not relevant to the question of whether the complaining officers were telling the truth regarding Higgenbottom's conduct. Similarly, a prosecutor's decision *to pursue a prosecution* has no more relevance to the complaining officer's credibility than the implicit relevance shared by all decisions to prosecute.

Importantly, the rule that Appellees urge us to adopt would place inappropriate pressures on both prosecutors and plaintiffs. If all cases of malicious prosecution were taken to trial, and prosecutors were called to testify about why they had originally pursued certain charges, then prosecutors might be subjected to great, though perhaps tacit, pressure from cities and police officers to maintain even a weak prosecution in order to undercut any subsequent malicious

21

prosecution claim. Similarly, plaintiffs who have legitimate claims of both malicious prosecution *and* other torts, such as false arrest (which almost always travels in malicious prosecution's sidecar), effectively would be forced to forgo their malicious prosecution claims. Otherwise, such plaintiffs would risk exposing all of their claims to highly prejudicial testimony from seemingly reputable sources—testimony a district judge would not consider admitting in the absence of the malicious prosecution claim.

For all these reasons, we hold that prosecutors' opinions as to probable cause and complaining officers' credibility are irrelevant in virtually all cases involving claims of malicious prosecution. In such cases, district courts remain bound by the rules of evidence that normally govern opinion testimony, and accordingly the District Court erred in allowing Peterson and the prosecutors to testify to the officers' credibility and to the existence of probable cause.

*D.      Harmless Error Analysis*

In this case, every factor that the Court considers in determining whether an evidentiary ruling was harmless counsels in favor of a new trial. First, the testimony bore on the two most important issues in the case: whether or not Ramos and Rivera were credible, and whether or not they had probable cause (a) to arrest Cameron and Higgenbottom and (b) to prosecute Cameron. Indeed, according to the jury charge, the only contested element of the false arrest claims was "whether Officer Rivera and Officer Ramos had probable cause," while the only issues in the malicious prosecution claim were (a) whether Ramos and Rivera had probable cause and (b) whether they acted with malice (which, the charge stated, could be inferred if the officers "acted without probable cause"). J.A. 658, 664. Similarly, Pangilinan's and Peterson's testimony that the security camera photos were consistent with the officers' accounts unmistakably bore on the same set of crucial questions.

22

Second, the improper testimony was not simply cumulative or corroborative. Rather, it provided strong external validation for propositions that otherwise would have come in *only* from the Appellees' mouths. Indeed, it told the jury what conclusions two prosecutors and a police lieutenant had drawn on the primary issues of the case, testimony that could hardly be considered duplicative of the other testimony the jury heard. The testimony is particularly significant because it came from ostensibly neutral government actors, whose opinions, understandably, will often greatly influence jurors. *See United States v. Grinage*, 390 F.3d 746, 752 (2d Cir. 2004).

Third, Appellees made use of the testimony in their opening statement and in summation. To be sure, as Appellees argue, these were only "brief references." Appellees' Br. 40. Nevertheless, counsel's arguments did drive home the incorrect idea that Brandon, rather than Ramos and Rivera, had "initiated" the proceeding, and emphasized Pangilinan's inadmissible and irrelevant belief "that it was appropriate to continue the prosecution against Ms. Cameron." J.A. 144.

Fourth, Appellees' case was not particularly strong. It essentially boiled down to a credibility contest between the officers and the Appellants. Appellees' statements had changed over time, and disagreed with each other in some material respects.[7] In such a case, testimony from three "impartial" law enforcement agents that the officers were to be believed is surely highly prejudicial.

For all these reasons, we cannot say with confidence that the erroneously admitted testimony was harmless. Accordingly, we must vacate the verdict and remand to the District Court for a new trial.

*E.  Testimony on Retrial*

While much of the challenged testimony was inadmissible, not everything that these

---

[7] For example, Rivera had said in his original complaints and at the criminal trial that Cameron had *both* her hands in the window; at the civil trial, he said that only her right hand was in the car. Ramos, by contrast, testified at the civil trial that both of Cameron's hands were in the window.

witnesses said should be prohibited upon retrial. It is therefore worth noting, in the interest of judicial economy, which particular pieces of testimony are inadmissible, and which the District Court has discretion to admit.

Most obviously, testimony that a third party (such as a prosecutor or a police supervisor) found the defendants to be credible should be excluded. Similarly, there is no justification for testimony that anybody but the defendants themselves believed that probable cause existed to arrest or prosecute Cameron and Higgenbottom.

As to Lieutenant Peterson, he testified about his personal observations when he arrived at the scene of the incident; such testimony seems entirely appropriate.[8] He also testified that, during the seven months preceding the incident, in which he supervised Officers Ramos and Rivera, he did not "see [Ramos] engage in any type of inappropriate behavior." J.A. 351. This seems relevant to Appellants' *Monell* claim, as it goes to the question of whether Ramos's supervisors were "faced with a pattern of misconduct and [did] nothing." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007). Peterson's testimony that he "thought that [the police] had probable cause to effect the arrest" and that he had no "reason to doubt the officers' account of the facts that day," J.A. 353, on the other hand, should not be permitted upon retrial. The first comment bears on neither the *Monell* issue nor the false arrest and malicious prosecution claims. The second comment, while it does in some ways relate to the *Monell* issue, extends far beyond Peterson's personal observations of Ramos's behavior and discusses directly Peterson's opinion

---

[8] The question of whether the *exclusion* of any testimony given during this trial would have been an abuse of discretion is not before us. In stating that some testimony "seems" appropriate, we do not mean to express any opinion on whether that testimony could or should be precluded (under Rule 403 or otherwise), but only suggest that such decisions likely fall within the District Court's discretion.

24

of her credibility.[9]  Nor can we see any reason for allowing Peterson to testify regarding the security camera photos, which he saw "[a] long time after this incident happened."  J.A. 359.  His opinion of how the pictures should be interpreted is entirely irrelevant, and his testimony on the subject added nothing that the jury could not see for itself by looking at the photos.

As to ADA Brandon, her testimony regarding the substance of her interactions with Officer Rivera seems entirely proper.  Her comments as to whether she had any reason not to believe Officer Rivera's account, and whether she believed that probable cause existed to arrest or charge Appellants, however, should be avoided on retrial.  Regarding Brandon's testimony that it was *her* decision to prosecute Cameron, and that Rivera had no "say in whether or not a criminal prosecution was initiated" and that Rivera did not "urge [her], encourage [her], or press [her] to proceed with the criminal prosecution," J.A. 271-72, we do not think that this testimony needs to be precluded—if, that is, it is accompanied by the District Court's clear and correct instruction that Ramos's and Rivera's conduct sufficed as a matter of law to "initiate" prosecution.  Whether the police officers aggressively sought prosecution, or only allowed the District Attorney's handling of the case to run its own course, seems probative on the important question of whether the officers acted with malice, and so the District Court would be within its discretion to permit the same testimony on retrial.

Finally, as to ADA Pangilinan, she should not be permitted to testify to her legal conclusions about the case, or to her opinions of the officers' credibility.  As with ADA Brandon,

---

[9] We have no occasion to decide whether comments such as these, or any other specific statements made during the course of the trial, would have been sufficient *on their own* to require vacatur; we mention them here merely to guide the District Court on retrial.  Similarly, because Appellants did object to the vast majority of the problematic testimony, we need not determine whether those statements to which they did not object would have constituted reversible error under plain error review.

25

we see nothing improper in her testifying about her interactions with Ramos and Rivera insofar as they allow the jury to draw appropriate inferences one way or another as to the officers' malice. It also would appear to be permissible for Pangilinan to testify as to the *content* of the 911 calls and the booking photo—Cameron's demeanor and statements in the former, and her appearance in the latter—as the photo and the tapes of the calls are no longer in existence and Pangilinan personally observed them. *See* Fed. R. Evid. 1004; *Glew v. Cigna Group Ins.*, 590 F. Supp. 2d 395, 413 (E.D.N.Y. 2008) ("Oral testimony has been admitted as secondary evidence, if the original is lost or destroyed.").[10] But she should not be allowed to state conclusions such as her opinions that the 911 calls "corroborated" the officers' version of events, that the security camera photos "actually strengthened [the] prosecution," and that the booking photo "supported to some extent continued prosecution of the case." J.A. 504-05.

**III.    Obstructing Governmental Administration Instruction**

We review challenges to a district court's jury instructions *de novo*. *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 115 (2d Cir. 2000). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *LNC Investments, Inc. v. First Fidelity Bank, N.A.*, 173 F.3d 454, 460 (2d Cir. 1999) (internal quotation marks omitted).

During the jury charge, the District Court instructed the jury that the offense of obstructing governmental administration was committed by interfering with "an official function," without defining that term. Appellants contend now, as they did below, that an arrest is only an "official function" under New York law *if it is lawful*—that is, if it is made with probable cause.

---

[10] Although they cite Rule 1004, Appellants do not argue that Appellees "lost or destroyed [the originals] in bad faith," as would be necessary to exclude the testimony on "best evidence" grounds. *See* Fed. R. Evid. 1004(1).

26

Accordingly, they argue, the District Court should have instructed the jury, regarding Higgenbottom's false arrest claim, that "[i]f . . . probable cause was lacking for Ms. Cameron's arrest, then defendants' actions were not authorized by law and [the jury's] verdict must be for Ms. Higgenbottom." J.A. 53. Although the District Court was right to reject the precise formulation that Appellants requested, Appellants' understanding of New York law is correct. Therefore, if on retrial Appellees argue that Higgenbottom's arrest was justified on the basis of a charge of obstruction of governmental administration, then the jury should be instructed that that basis for arrest could only be lawful if Cameron's arrest was itself lawful.[11]

Under New York law, obstructing governmental administration has four elements: "(1) prevention or attempt to prevent (2) a public servant from performing (3) an official function (4) by means of intimidation, force or interference." *Lennon v. Miller*, 66 F.3d 416, 424 (2d Cir. 1995); *see also* N.Y. Penal Law § 195.05. In New York, however, for an arrest to be "an official function," it must be lawful. *See, e.g.*, *People v. Perez*, 47 A.D.3d 1192, 1193-94, 851 N.Y.S.2d 747, 749 (App. Div. 4th Dep't 2008); *People v. Greene*, 221 A.D.2d 559, 560, 623 N.Y.S.2d 144, 145 (App. Div. 2d Dep't 1995); *cf. People v. Stevenson*, 286 N.E.2d 445, 448, 31 N.Y.2d 108, 111 (1972) ("[T]he crime of resisting arrest does not occur if the arrest is illegal or unlawful."). Appellees essentially argue that *any* arrest, lawful or otherwise, by a police officer is an "official function." But this proposition finds no support in New York case law.

Accordingly, if Ramos and Rivera's arrest of Cameron was not lawful—e.g., if they knew that they did not possess probable cause to arrest her for any crime—then they could not have probable cause to arrest Higgenbottom for obstructing governmental administration. On retrial,

---

[11] Appellants do not argue that either error in the jury charge would have warranted reversal, and we do not so hold; we only address the jury charge because both issues may arise if the case proceeds to retrial.

27

an instruction explaining this legal nuance to the jury would be appropriate. That said, the specific instruction that Appellants requested at trial was not quite correct. Ramos and Rivera legitimately could have arrested Higgenbottom for disorderly conduct even if they did not have probable cause to arrest her for the separate offense of obstructing governmental administration. *See* N.Y. Penal Law § 240.20. As a result, a more appropriate instruction with respect to an arrest based on obstruction of government administration might read along the following lines: "For an arrest to be an official function, it must be lawful and supported by probable cause. Therefore, if the Officers did not have probable cause to arrest Ms. Cameron, they could not have had probable cause to arrest Ms. Higgenbottom for obstructing their efforts to effect Ms. Cameron's arrest." Nothing we have said here with respect to the jury charge is intended thereby to limit what Appellees may present as bases for the arrest of Higgenbottom, and the District Court is obviously free on retrial to accommodate its charge to whatever theories of liability and defense the parties may present.

## IV. Punitive Damages Instruction

Appellants' final claim challenges the District Court's decision not to instruct the jury that it could consider awarding punitive damages if it found for Appellants. We agree that this was error. To warrant an instruction, "[a]ll that a party needs to show is that there is some evidence supporting the theory behind the instruction so that a question of fact may be presented to the jury." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). A punitive damages instruction is appropriate when the plaintiffs have produced evidence that "the defendant's conduct is . . . motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others," or, in other words, when the plaintiffs have produced evidence of "a positive element of

conscious wrongdoing" or "malice." *New Windsor Volunteer Ambulance Corps., Inc. v. Meyers*, 442 F.3d 101, 121-22 (2d Cir. 2006) (internal quotation marks omitted). The plaintiffs' evidence need only be enough "to permit the factfinder to *infer* that the responsible official was motivated by malice or evil intent or that he acted with reckless or callous indifference." *Id.* at 122 (emphasis added).

In denying Appellants' request for the instruction, the District Court concluded that there was "no evidence that [Ramos and Rivera's] actions were wanton, malicious or reckless." J.A. 497. But it is long-settled that "the lack of probable cause may give rise to an inference of malice." *Morrissey v. Nat'l Maritime Union*, 544 F.2d 19, 29 (2d Cir. 1976) (quoting *Prosser on Torts* § 119 at 848-49 (1971 ed.)); *see also N. Oil Co. v. Socony Mobil Oil Co.*, 347 F.2d 81, 84 (2d Cir. 1965); *Reisterer v. Lee Sum*, 94 F. 343, 346 (2d Cir. 1899). In this case, Appellants alleged that Ramos and Rivera knew that they lacked probable cause to suspect Cameron or Higgenbottom of any crime but arrested them anyway, and then proceeded to provide false information to the Bronx District Attorney's Office that led to Cameron's prosecution. While a jury was free to reject this version of events, the evidence at trial was at least minimally sufficient to support it. Had the jury accepted Appellants' account, it could have readily inferred that Ramos and Rivera were conscious of their alleged wrongdoing and hence acted maliciously. Accordingly, a question of fact as to malice was presented to the jury. And this made a punitive damages instruction appropriate. *See Anderson*, 17 F.3d at 557.

## CONCLUSION

We AFFIRM the District Court's denial of Appellants' Rule 50 motion, but VACATE the judgment and REMAND for a new trial on Appellants' Rule 59 motion.