10-3916-cr
United States v. Siddiqui

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2011

(Argued: February 10, 2012       Decided: November 5, 2012)

Docket No. 10-3916-cr

_____

UNITED STATES OF AMERICA,

*Appellee*,

–v.–

AAFIA SIDDIQUI,

*Defendant–Appellant.*[*]

_____

Before:
 WESLEY, CARNEY, *Circuit Judges*, MAUSKOPF, *District Judge*.[**]

Defendant-Appellant Aafia Siddiqui appeals her criminal convictions, entered after a jury trial in the United States District Court for the Southern District of New York (Berman, *J.*), for attempted murder of United States nationals, attempted murder of United States officers and employees, armed assault of United States officers and employees, assault of United States officers and employees, and use of a firearm during a crime of violence.  She also challenges her sentence of eighty-six years' imprisonment.  Siddiqui contends that the district court erred in a number

_____

[*]The Clerk of the Court is respectfully directed to amend the caption to conform with the above.

[**]The Honorable Roslynn R. Mauskopf, of the United States District Court for the Eastern District of New York, sitting by designation.

of ways.  We address five of Siddiqui's arguments here:(1) that Count One of the indictment was deficient because the Attorney General failed to timely issue a required certification for prosecution under 18 U.S.C. § 2332, and because the statutes underlying Counts Two through Seven do not apply extraterritorially in an active theater of war; (2) that the district court committed reversible error by admitting, under Federal Rule of Evidence 404(b), documents allegedly found in her possession at the time Afghan officials took her into custody; (3) that the district court erred in allowing her to testify in her own defense despite a request from defense counsel to preclude her from doing so because of her alleged mental illness; (4) that the district court erred in allowing the government to rebut her testimony with un-*Mirandized* statements she gave to FBI agents while hospitalized at Bagram Airfield because those statements allegedly were not voluntary; and (5) that the district court erred in applying the terrorism enhancement under section 3A1.4 of the United States Sentencing Guidelines.  We address Siddiqui's remaining arguments in an accompanying summary order.

AFFIRMED.

---

DAWN M. CARDI (Chad L. Edgar, *on the brief*), Dawn M. Cardi & Associates, New York, NY, *for Defendant-Appellant*.

JENNA M. DABBS, Assistant United States Attorney (Christopher L. Lavigne, Jesse M. Furman, Assistant United States Attorneys, *on the brief*), *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, *for Appellee*.

---

WESLEY, *Circuit Judge*:

Defendant-Appellant Aafia Siddiqui appeals from a judgment of the United States District Court for the

Southern District of New York (Berman, *J.*) entered on September 23, 2010, convicting her after a jury trial of one count of attempted murder of United States nationals in violation of 18 U.S.C. § 2332(b)(1); one count of attempted murder of United States officers and employees in violation of 18 U.S.C. § 1114(3); one count of armed assault of United States officers and employees in violation of 18 U.S.C. §§ 111(a)(1) and (b); one count of using a firearm during a crime of violence in violation of 18 U.S.C. § 924(c); and three counts of assault of United States officers and employees in violation of 18 U.S.C. § 111(a)(1). The district court sentenced her principally to 86 years' imprisonment. Siddiqui urges this Court to reverse her convictions and, failing that, to vacate her sentence. We address five of the arguments that Siddiqui raises on appeal here and the remaining issues in an accompanying summary order.

## I. BACKGROUND

**A. Offense Conduct**

Around dusk on July 17, 2008, Afghan National Police ("ANP") detained Aafia Siddiqui, a United States-educated Pakistani national, in Ghazni City, Afghanistan, on

3

suspicion of attempting to attack the Governor of Ghazni. When police took her into custody, Siddiqui possessed, among other things, various documents that discussed the construction of weapons, referenced a "mass casualty attack," and listed a number of New York City landmarks. Afghan authorities brought Siddiqui to an ANP facility for questioning. Later that evening, the Governor of Ghazni delivered the materials found in Siddiqui's possession to the United States Army.

The following morning, the United States dispatched a team to the ANP facility with the objective of interviewing Siddiqui and ultimately taking her into American custody. The team—most dressed in military fatigues—consisted of two FBI agents and members of a military special forces unit. Afghan officials brought the team to a poorly lit room partitioned by a yellow curtain. The room was crowded with Afghan officials, and unbeknownst to the Americans, Siddiqui was sequestered unrestrained behind the curtain.

The presence of a large number of Afghan officials led members of the American team to believe that they had been brought to the room to discuss the terms of their access to Siddiqui. One of the team members, a Chief Warrant Officer,

moved to a chair near the curtain dividing the room.  After quickly glancing behind the curtain and seeing nothing, he set down his M-4 rifle and turned to engage the Afghan officials in conversation.  Moments later, Siddiqui gained control of the rifle, aimed it at members of the American team, shouted, and fired.  The team's interpreter lunged at and struggled with Siddiqui.  As the interpreter wrestled with her, the Chief Warrant Officer drew his sidearm and shot Siddiqui in the stomach.

Team members then attempted to restrain Siddiqui, who was fiercely resisting and screaming anti-American statements.  One witness recalled Siddiqui stating, "I am going to kill all you Americans.  You are going to die by my blood."  Another recounted that Siddiqui yelled "death to America" and "I will kill all you motherfuckers."

Eventually, the Americans were able to subdue Siddiqui enough to begin to render emergency medical aid to her. After providing preliminary treatment at the scene, the Americans transported her to a number of military bases in Afghanistan to undergo surgery and receive further care.  On July 19, 2008, American forces moved Siddiqui to Bagram Airfield to recuperate.

While recovering at Bagram, Siddiqui was guarded by an FBI team. She was tethered to her hospital bed in soft restraints. During the course of her stay at Bagram, Siddiqui provided a number of incriminating, un-*Mirandized* statements to two members of the security team. In particular, she (1) asked about the penalty for attempted murder; (2) stated that she had a number of documents in her possession at the time of her arrest and recognized some of them when shown to her; (3) said that she had picked up a rifle with the intention of scaring the American team and escaping; and (4) noted that "spewing" bullets at Americans was a bad thing.

The government filed a sealed criminal complaint against Siddiqui in the Southern District of New York on July 31, 2008. On August 4, 2008, the government transferred Siddiqui to the United States for prosecution. A month later, Siddiqui was indicted.

**B. Pre-Trial**

Soon after the indictment was filed, the district court ordered that Siddiqui undergo psychiatric evaluations of her competence to stand trial. In a report issued on November 6, 2008, Dr. Leslie Powers opined that Siddiqui was not

6

currently competent, citing, among other things, Siddiqui's reports of visual hallucinations.  Later, Dr. Powers revised her assessment, finding that Siddiqui was malingering to avoid prosecution.  Other experts arrived at the same conclusion, although one expert commissioned by the defense opined that Siddiqui was not competent.  The district court held a competency hearing on July 6, 2009.  After canvassing the relevant evidence, the court found Siddiqui competent to stand trial.

In advance of trial, the district court ruled on a number of motions, some of which are relevant here. Siddiqui first moved to dismiss all of the counts of the indictment.  As to Count One, Siddiqui claimed that the Attorney General failed to timely issue the required written certification that her offense (attempted murder of United States nationals) "was intended to coerce, intimidate, or retaliate against a government or a civilian population."[1] 18 U.S.C. § 2332(d).  Siddiqui also contended that Counts Two through Seven, charging violations of 18 U.S.C. §§ 1114, 111, and 924(c), should be dismissed because the statutes do not have extraterritorial application under the

---

[1]The certification was filed on the same day as the indictment.

7

circumstances of her case. The district court denied Siddiqui's motions.

The district court also considered the government's motion in limine to admit certain documents and other evidence recovered from Siddiqui at the time of her arrest by Afghan officials. These documents, some of which were in Siddiqui's handwriting and bore her fingerprints, referred to attacks on the United States and the construction of various weapons. The court found this evidence admissible pursuant to Federal Rule of Evidence 404(b) to show Siddiqui's "motive, intent, identity, and knowledge." In finding the documents admissible, the court rejected the argument that the evidence would cause Siddiqui unfair prejudice, concluding that the documents were no more sensational than the crimes charged. The court also noted that it would instruct the jury that the documents were not to be considered as propensity evidence.

**C. Trial**

At trial, the government presented six members of the American interview team who testified that Siddiqui gained control of the Chief Warrant Officer's rifle and fired at them. Three more witnesses who did not directly observe the

8

shooting testified that they heard M-4 rifle shots. A government expert testified that the fact that no gunpowder residue was found on the curtain hanging in the room did not necessarily indicate that an M-4 had not been fired because someone standing between the curtain and the weapon could have absorbed the residue. The government also introduced the 404(b) documents discussed above.[2]

The defense put forth a forensic metallurgist who, based on the lack of forensic evidence of a discharge of a M-4 rifle at the crime scene, testified that he did not believe an M-4 had been fired in the room. In particular, he found it implausible that someone could discharge an M-4 rifle in a room without bullet fragments or gunpowder residue being recovered by authorities. The defense also introduced deposition testimony of an ANP officer that when Siddiqui was arrested she possessed documents describing how to make explosive devices, among other things, and that while in Afghani custody she made anti-American statements and asked not be turned over to the United States. He also

---

[2]The district court gave a limiting instruction to the jury, informing them that they could not consider the documents as proof that Siddiqui was predisposed to commit the crimes charged. The district court made clear that the documents could only be considered to the extent they demonstrated Siddiqui's motive, intent, or knowledge.

9

stated that he saw an American soldier walk behind the curtain prior to hearing shots fired, although he did not directly observe the shooting.[3]  Significantly, the officer testified that he observed a technician remove two rifle shells from the scene.

Against the advice and over the objection of her attorneys, Siddiqui took the stand to testify in her own defense.[4]  Though her testimony at times lacked focus, she was able to provide her version of the events that transpired on July 18, 2008.  According to Siddiqui, she was sitting behind a curtain in a room at the ANP facility when she heard American voices.  She feared being taken into American custody and peeked through an opening in the curtain with the hope of finding an escape route.  Siddiqui testified that she was then shot from multiple directions.

---

[3]The government elicited admissions from the officer that he previously gave inconsistent statements to American investigators.

[4]Defense counsel viewed this as a disastrous decision, and went so far as to make an application to the court to prevent Siddiqui from testifying. In their view, Siddiqui suffered from diminished capacity, such that she did not appreciate the risks inherent in testifying.  Further, based on previous outbursts during the proceedings, they feared that Siddiqui would "turn the [trial] into a spectacle," thus alienating the jury and damaging her prospects for acquittal.  Prior to Siddiqui's testimony, the defense held an ex parte conference with the judge where they aired their concerns.  The judge then opened the courtroom to the public, and Siddiqui indicated on the record that she understood (1) that testifying was a significant decision, and one that her counsel had unanimously recommended against; (2) that her testimony had to be relevant; (3) that if she veered off into tangential topics the court may stop her testimony; and (4) that by testifying she would be subject to an intense cross-examination aimed at undercutting her testimony.

She stated that she never picked up, aimed, or fired an M-4 rifle at the Americans.

Siddiqui claimed that she could not confirm that she possessed documents at the time of her arrest in Afghanistan because she was "in a daze." JA 2371. She stated that the bag in which the documents were found was not hers but rather was given to her. When confronted with the document referencing mass casualty attacks and listing New York City landmarks, Siddiqui testified that it was a "possibility" that the document was in her own handwriting. JA 2372.

After the defense rested, the government presented its rebuttal case. Two FBI agents who were members of Siddiqui's security detail during her recovery at Bagram recounted several incriminating statements that Siddiqui made to them. Before receiving this testimony, the district court held a hearing to determine whether Siddiqui gave these un-*Mirandized* statements voluntarily.[5] At that hearing, the two FBI agents testified, as did Siddiqui. The district court determined that Siddiqui's statements were voluntary.

---

[5]The court conducted this voluntariness inquiry prior to admitting Siddiqui's testimony, and the government asked Siddiqui about her statements during its cross-examination in an attempt to impeach her. On cross-examination, she denied she made the statements.

On February 3, 2010, the jury returned a guilty verdict on all counts of the indictment. The district court sentenced Siddiqui on September 23, 2010. In addition to a number of other enhancements, the court applied the terrorism enhancement pursuant to U.S.S.G. § 3A1.4. In applying the enhancement, the court found that Siddiqui's offense was calculated to influence the conduct of the government by intimidation, namely, attempting to frustrate the interview team's efforts to detain her. Further, based on a number of anti-American statements Siddiqui made before and at the time of the shooting, the court determined that Siddiqui's conduct was calculated to retaliate against the United States government. The district court sentenced Siddiqui principally to 86 years' imprisonment and five years of supervised release.

Siddiqui timely appealed her convictions and sentence.

## II. DISCUSSION

### A. Denial of Siddiqui's Motion to Dismiss the Indictment

Siddiqui raised below, and now reasserts, several challenges to the indictment. According to Siddiqui, the district court should have dismissed Count One, which charged a violation of 18 U.S.C. § 2332, because the United

12

States Attorney General did not timely issue the certification required by 18 U.S.C. § 2332(d). She also argues that the remaining counts are deficient because the underlying statutes do not apply extraterritorially in an active theater of war. We disagree.

Section 2332(d) provides that "[n]o prosecution for any offense described in this section shall be undertaken by the United States except on written certification of the Attorney General . . . [that] such offense was intended to coerce, intimidate, or retaliate against a government or civilian population." Siddiqui relies on speedy trial principles to conclude that a prosecution is commenced at the time of arrest or the filing of formal charges. But Siddiqui's argument here encounters an obstacle: the original complaint on which Siddiqui was arrested did not charge a violation of § 2332. The first instrument to do so was the indictment, which was filed the same day the Attorney General issued the § 2332(d) certification.

Siddiqui has an answer to the problem. She points out that the statute requires certification prior to a prosecution for an "offense *described* in this section." 18 U.S.C. § 2332(d) (emphasis added). In her view, the

13

Attorney General is required to issue the certification before an accusatory instrument describing facts that could constitute a violation of § 2332 is filed, regardless of whether that instrument actually charges a violation of § 2332.  Siddiqui reasons that because the criminal complaint filed on July 31, 2008 described conduct proscribed by § 2332, the Attorney General's certification filed the day of the indictment was untimely.

Siddiqui's argument offers an unusual reading of what appears to be straightforward statutory language—a reading that would undercut the very purpose of the provision. Section 2332(d)'s requirement that the Attorney General issue a certification before "prosecution for any offense described in [§ 2332] *shall be undertaken*" is most naturally read as a requirement that the Attorney General issue the certification either at the time of or before the filing of the first instrument charging a violation of § 2332.  This view furthers the purpose of § 2332(d)—namely, ensuring that the statute reaches only terrorist violence inflicted upon United States nationals, not "[s]imple barroom brawls or normal street crime."  *See* H.R. Conf. Rep. 99-783, at 87, *reprinted in* 1986 U.S.C.C.A.N. 1926, 1960.

14

Under Siddiqui's interpretation of the provision, the Attorney General would have to issue the certification any time someone engaged in conduct that could be covered by the statute. This would deprive the Attorney General of the opportunity to sort through the facts of each case to determine if it merited certification—and prosecution—under the statute. More simply put, Siddiqui's interpretation would undercut § 2332(d)'s primary objective. Accordingly, the district court did not err in denying Siddiqui's motion to dismiss Count One of the indictment.

Siddiqui next contends that Counts Two through Seven of the indictment should be dismissed because the charging statutes—18 U.S.C. §§ 1114,[6] 111,[7] and 924(c)[8]—do not have application extraterritorially "in an active theater of war." This argument is without merit.

"Congress has the authority to 'enforce its laws beyond the territorial boundaries of the United States.'" *United States v. Yousef*, 327 F.3d 56, 86 (2d Cir. 2003) (quoting

---

[6]18 U.S.C. § 1114 prohibits the murder or attempted murder of any United States officer or employee while such officer or employee is engaged in, or on account of, his or her official duties.

[7]18 U.S.C. § 111 punishes those who assault, resist, oppose, impede, intimidate, or interfere with a United States officer or employee while he or she is engaged in, or on account of, his or her official duties.

[8]18 U.S.C. § 924(c) prohibits the use of a firearm during the commission of a crime of violence.

15

*EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)). The ordinary presumption that laws do not apply extraterritorially has no application to criminal statutes. *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011). "When the text of a criminal statute is silent, Congressional intent to apply the statute extraterritorially must 'be inferred from the nature of the offense.'" *Id.* (quoting *United States v. Bowman*, 260 U.S. 94, 98 (1922)).

The statutes underlying Counts Two through Seven apply extraterritorially. Subsequent to the filing of Siddiqui's brief, we held that 18 U.S.C. § 1114 applies extraterritorially. *Al Kassar*, 660 F.3d at 118. We reasoned that "the nature of the offense-protecting U.S. personnel from harm when acting in their official capacity-implies an intent that [the statute] apply outside of the United States." *Id.* We see no basis for expecting Congress to have intended to limit these protections to U.S. personnel acting within the United States only. For the same reason, § 111 applies extraterritorially. *See United States v. Benitez*, 741 F.2d 1312, 1316-17 (11th Cir. 1984); *see also United States v. Hasan*, 747 F. Supp. 2d 642, 685-86 (E.D. Va. 2010). Like 18 U.S.C. § 1114, the nature of the

16

offense-protecting United States officers and employees engaged in official duties from harm-implies a Congressional intent that § 111 apply outside of the United States. *See Al Kassar*, 660 F.3d at 118.

As for § 924, which criminalizes the use of a firearm during commission of a crime of violence, every federal court that has considered the issue has given the statute extraterritorial application where, as here, the underlying substantive criminal statutes apply extraterritorially. *See, e.g.*, *United States v. Belfast*, 611 F.3d 783, 815 (11th Cir. 2010); *United States v. Ahmed*, No. 10 Cr. 131 (PKC), 2012 WL 983545, at *2 (S.D.N.Y. March 22, 2012); *United States v. Mardirossian*, 818 F. Supp. 2d 775, 776-77 (S.D.N.Y. 2011). We see no reason to quarrel with their conclusions.

Siddiqui's argument that the statutes, even if generally extraterritorial, do not apply "in an active theater of war" is unpersuasive.[9] As the government points

---

[9]Indeed, this argument is premised on a misreading of a number of cases. Siddiqui contends that international law "allow[s] an occupying force to try unlawful belligerents only in a military commission," *see* Siddiqui Br. 66, and thus extraterritorial application of the statutes at issue would run afoul of the general presumption that Congress intends its statutes to comport with international law. But the portion of *Ex parte Quirin*, 317 U.S. 1, 30 (1942), that Siddiqui cites merely stands for the more pedestrian observation that unlawful combatants, unlike lawful combatants, *may be* subjected to trial before a military commission. Moreover, the case Siddiqui cites for the proposition that "[a]t least one court has expressed reservation about

out, it would be incongruous to conclude that statutes aimed at protecting United States officers and employees do not apply in areas of conflict where large numbers of officers and employees operate.  The district court appropriately denied Siddiqui's motion to dismiss Counts Two through Seven of the Indictment.

**B. Admission of Documents under Federal Rule of Evidence 404(b)**

The district court admitted documents allegedly found in Siddiqui's possession that explained the construction and use of various weapons and described a "mass casualty attack" on a number of New York City landmarks for the purpose of demonstrating Siddiqui's knowledge, motive, and intent.  Siddiqui argues that her defense-that she never picked up and fired the Chief Warrant Officer's rifle-removed those issues from the case and thus admission of the documents was improper.

A district court's evidentiary rulings encounter trouble on appeal only where the district court abuses its discretion.  *United States v. Mercado*, 573 F.3d 138, 141 (2d

extending the extraterritorial reach of § 1114 into Afghanistan because of the sensitive state of the relationship between the two nations," *see* Siddiqui Br. 65-66, does not mention § 1114 at all.  Instead, the case addressed whether federal courts had jurisdiction to afford habeas corpus relief and the protection of the Suspension Clause to aliens held in Executive detention at Bagram Airfield.  *Al Maqaleh v. Gates*, 605 F.3d 84, 99 (D.C. Cir. 2010).

18

Cir. 2009).   A district court abuses its discretion when its evidentiary rulings are "arbitrary and irrational." *Id*. But even when an evidentiary ruling is "manifestly erroneous," the defendant will not receive a new trial if admission of the evidence was harmless.  *Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010).

Federal Rule of Evidence 404(b) provides that evidence of a defendant's prior crimes, wrongs, or other acts cannot be used to prove that a defendant was a bad fellow and most likely remains one-that he has a criminal nature or propensity and the acts in question are consistent with his nature or tendency towards crime.  However, this type of evidence may be admissible for other legitimate purposes, such as demonstrating motive, opportunity, identity, intent, and knowledge.  *Id.*  Under our "inclusionary" approach, all "other act" evidence is generally admissible unless it serves the sole purpose of showing a defendant's bad character.  *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011).[10]

---

[10]Of course, the strictures of Federal Rules of Evidence 401, 402, and 403 still apply to Rule 404(b) evidence.  The evidence must be relevant to an issue in dispute, and its probative value must outweigh the risk of unfair prejudice.  *See United States v. Colon*, 880 F.2d 650, 656 (2d Cir. 1989).

19

A defendant may, however, forestall the admission of Rule 404(b) evidence by advancing a theory that makes clear that the object the 404(b) evidence seeks to establish, while technically at issue, is not really in dispute. *See United States v. Colon*, 880 F.2d 650, 656 (2d Cir. 1989). For example, a defense theory that the defendant did not commit the charged act effectively removes issues of intent and knowledge from the case. *See id* at 657; *United States v. Ortiz*, 857 F.2d 900, 904 (2d Cir. 1988). Siddiqui's defense was just that-"I didn't fire the M-4."

But even assuming that Siddiqui's defense theory effectively removed any issue of her intent or knowledge, the documentary evidence remained relevant to demonstrate Siddiqui's motive. Motive has been variously defined as "the reason that nudges the will and prods the mind to indulge the criminal intent," *United States v. Benton*, 637 F.2d 1052, 1056 (5th Cir. 1981) (internal quotation marks omitted); "the rationale for an actor's particular conduct," *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010); and "an emotion or state of mind that prompts a person to act in a particular way," Charles Alan Wright and Kenneth W. Graham, Jr., *Federal Practice and Procedure: Federal Rules*

*of Evidence* § 5240.  "Although it does not bear directly on the charged elements of a crime, evidence offered to prove motive is commonly admitted."  *United States v. Salameh*, 152 F.3d 88, 111 (2d Cir. 1998).  And unlike issues of knowledge and intent, the defendant's motive–an explanation of *why* the defendant would engage in the charged conduct–becomes highly relevant when the defendant argues that he did not commit the crime.

For instance, in *Salameh*, the defendants were charged with a conspiracy to bomb the World Trade Center.  *Id.* at 108.  The district court admitted documents possessed by the defendants that "bristled with strong anti-American sentiment."  *Id.* at 111.  On appeal, we found those documents admissible to demonstrate the conspiracy's motive.  *Id.*

Here, the documents the government introduced pursuant to Rule 404(b) detail, among other things, the construction of fertilizer and plastic explosives.  One document in particular discusses radioactive bombs, biological weapons, and chemical weapons.  That document also contains the phrase "mass casualty attack" and lists a number of New York City landmarks, including Grand Central Terminal, the Empire

21

State Building, the Statute of Liberty, and the Brooklyn Bridge. Taken together, these documents, which were in Siddiqui's possession at the time Afghan officials took her into custody[11] and some of which were in her handwriting, supply a plausible rationale for why Siddiqui would fire a rifle at the American interview team, namely, she harbored an anti-American animus. This motive was relevant to *the* ultimate issue in dispute at trial–whether Siddiqui picked up and fired the M-4 rifle at the American interview team. Accordingly, the district court did not abuse its discretion in admitting the documents pursuant to Rule 404(b).[12]

But even if we agreed with Siddiqui that the district court abused its discretion in admitting the documents, that would not end the matter. There would remain the question

---

[11] In her brief, Siddiqui appears to contend that the government was required to call Afghan witnesses who were present at Siddiqui's arrest to confirm this fact. We disagree. There was more than sufficient evidence to establish that the documents were in Siddiqui's possession at the time of her arrest. Some were in her handwriting, and some bore her fingerprints. Moreover, on the day of her arrest, Afghan officials delivered the documents to American military authorities, which also tends to corroborate that Siddiqui possessed the documents when arrested by Afghan authorities.

[12] Although Siddiqui often characterizes the admitted documents as "adverse and prejudicial," "incendiary," and "powerful, prejudicial, and damning," she never argues in her briefs that the evidence should have been excluded under Federal Rule of Evidence 403 on a theory that its probative value is substantially outweighed by a danger of unfair prejudice. As such, the argument is waived. *See Tolbert v. Queens College*, 242 F.3d 58, 76 (2d Cir. 2001); *see also Frank v. United States*, 78 F.3d 815, 833 (2d Cir. 1996), *vacated on other grounds by*, 521 U.S. 1114 (1997).

22

of whether the error was harmless.  An evidentiary error is harmless "if the appellate court can conclude with fair assurance that the evidence did not substantially influence the jury."  *United States v. Cadet*, 664 F.3d 27, 32 (2d Cir. 2011) (internal quotation marks omitted).  Several factors bear on the inquiry: whether the evidence was tied to "an issue that [was] plainly critical to the jury's decision"; "whether that [evidence] was material to the establishment of the critical fact or whether it was instead corroborat[ive] and cumulative"; and "whether the wrongly admitted evidence was emphasized in arguments to the jury." *Curley*, 639 F.3d at 58 (internal quotation marks omitted). But the most critical factor is "the strength of the government's case."  *Id.* (internal quotation marks omitted).

Here, although the government by its own admission "repeatedly referenced the documents introduced at trial," Government Br. 37, the jury also had ample testimony before it regarding anti-American statements Siddiqui made at the time of the shooting from which it could conclude that Siddiqui harbored an animus towards the United States.  And most importantly, the strength of the government's case was overwhelming.  Among other evidence, *six* members of the

23

American interview team testified that Siddiqui gained control of the Chief Warrant Officer's rifle and fired at them.  Another three government witnesses who did not observe the shooting testified that they heard M-4 rifle shots.  Moreover, after Siddiqui testified, the government introduced the testimony of two FBI agents who had interviewed Siddiqui.  According to those agents, Siddiqui, among other things, (1) asked what the penalty for attempted murder was; and (2) noted that "spewing" bullets at Americans was a bad thing.

Siddiqui counters that her forensic expert's opinion that an M-4 rifle had not been fired in the room effectively neutralized the government's case against her.  However, this forensic expert's testimony was undermined by one of Siddiqui's own witnesses, who testified that two rifle shells were recovered from the room, and by a government expert's testimony that the absence of certain forensic evidence from the room was not necessarily inconsistent with the firing of a weapon.

Siddiqui also asserts that our decision in *United States v. Colon*, 880 F.2d 650 (2d Cir. 1989), requires us to grant her a new trial.  She argues that *Colon* mandates that

24

we assess the strength of the government's case without reference to the government's cross-examination of Siddiqui or the incriminating statements she made at Bagram and that *Colon* requires a new trial because the admission of the documents forced her to testify and she was harmed by doing so.  We disagree.

In *Colon*, the defendant was charged with heroin distribution. *Id.* at 652.  His defense was that he did not engage in the charged act.  *Id.* at 658.  Nevertheless, the district court admitted evidence concerning two prior instances in which the defendant had sold heroin to demonstrate knowledge and intent–an obvious error.  *Id.* at 656.  The defendant then testified, and, in the words of his counsel, "the [Assistant] U.S. Attorney made a jackass out of him."  *Id.* at 661 (brackets in original).  Specifically, the cross-examination cast doubt on the defendant's credibility and delved deeply into the circumstances surrounding the defendant's prior involvement with heroin. *Id.*  Because the record in *Colon* demonstrated that the defendant's case was badly damaged by the erroneous admission of the evidence, and because the defense may have felt that there was no alternative but to have the defendant

testify as a result, we granted the defendant a new trial. *See id.* at 661-62.

Here, we need not resolve the issue of whether *Colon* necessitates that we measure the strength of the Government's case without reference to either Siddiqui's cross-examination or the admission of the incriminating statements she made at Bagram. Even without that evidence, the government's case against Siddiqui can only be fairly characterized as devastating.

We also disagree with Siddiqui's claim that *Colon* requires a new trial because the admission of the 404(b) evidence forced her to testify and her defense was badly damaged by that testimony. Unlike in *Colon*, the introduction of the 404(b) evidence here did not necessitate Siddiqui's testimony from an objective, strategic standpoint. The 404(b) evidence was somewhat cumulative on the issue of whether Siddiqui harbored an anti-American animus, given that numerous witnesses testified as part of the government's case-in-chief that she made anti-American statements during the shooting incident. Further, even after the introduction of the 404(b) evidence, defense counsel advised Siddiqui not to testify, we presume in large

26

part because her testimony would open the door to the admission of the incriminating statements she made while recovering at Bagram. *Colon* does not allow a defendant to make an otherwise harmless error harmful based on her simple assertion that the error compelled her to testify.

**C. Denial of Defense Counsel's Application to Keep Siddiqui from Testifying**

It is well established that criminal defendants have the right to testify in their own defense. *Rock v. Arkansas*, 483 U.S. 44, 49 (1987); *see Brown v. Artuz*, 124 F.3d 73, 76 (2d Cir. 1997). "This right . . . is . . . essential to due process of law in a fair adversary process." *Bennett v. United States*, 663 F.3d 71, 84 (2d Cir. 2011) (internal quotation marks omitted). That is because "the most important witness for the defense in many criminal cases is the defendant himself," and he has the "right to present his own version of events in his own words." *Rock*, 483 U.S. at 52. The ultimate decision to testify remains at all times with the defendant; defense counsel, though charged with an obligation to apprise the defendant of the benefits and risks of testifying, cannot make the decision, regardless of tactical considerations. *Brown*, 124 F.3d at 77-78.

27

Siddiqui's counsel does not challenge these clearly established principles. Instead, she urges us to craft an exception to the general rule, arguing that in some cases a defendant may be competent to stand trial yet incompetent to exercise her right to testify without the approval of defense counsel.

In support of her argument, counsel relies heavily on the Supreme Court's decision in *Indiana v. Edwards*, 554 U.S. 164 (2008). There, the Court held that a state may determine that a defendant who is competent to stand trial may nonetheless be incapable of representing himself at trial and may thus insist that the defendant have trial counsel. *Id.* at 167. The Court noted that a mentally ill defendant may not possess the ability to execute tasks such as organizing a defense, arguing points of law, and questioning witnesses. *Id.* at 176-77. It further observed that a prolonged spectacle could result from such a defendant representing himself, and that spectacle would undercut the Constitution's goal of providing a fair trial. *Id.* at 177.

Counsel's reliance on *Edwards* is misplaced. First, as three other circuits have recognized, *Edwards* holds that a

court may require that trial counsel appear on behalf of a mentally ill defendant, not that it must do so. *See United States v. Turner*, 644 F.3d 713, 724 (8th Cir. 2011); *United States v. Berry*, 565 F.3d 385, 391 (7th Cir. 2009); *United States v. DeShazer*, 554 F.3d 1281, 1290 (10th Cir. 2009). But even if *Edwards* mandated trial courts to require trial counsel for a discrete group of mentally ill defendants, the case still would have no application here. Common sense dictates that the mental capacity needed to conduct an entire trial is much greater than the mental capacity required to play the more limited role of witness on one's own behalf. Moreover, the defendant's right to air her version of events before a jury is "more fundamental to a personal defense than the right of self-representation." *Rock*, 483 U.S. at 52. As such, *Edwards* does not significantly support, let alone compel, the conclusion that a district court may prevent a mentally ill defendant from testifying on her own behalf if defense counsel moves to keep the defendant off the stand.

We question whether the Constitution permits a finding that a criminal defendant is competent to stand trial, yet incompetent to determine whether to testify on her own

behalf. But we need not decide that question today. Here, the district court went to extraordinary lengths to ensure that Siddiqui understood the implications of testifying and had the capacity to testify. Even were we to discern any daylight between the standards governing a defendant's capacity to stand trial and those for assessing her capacity to determine whether to testify (and then, actually to testify), we would find no reason to upset the district court's implicit determination that Siddiqui did in fact have the requisite capacity to make the latter decision here. That Siddiqui's choice to testify—like many defendants' decisions to testify—was a poor one, does not alter our analysis. *See Brown*, 124 F.3d at 77-78.

**D. Voluntariness of Siddiqui's un-*Mirandized* statements at Bagram**

Siddiqui contends that the district court erred in finding that the incriminating, un-*Mirandized* statements she gave to two members of the FBI security team while she was hospitalized at Bagram Airfield were voluntary and thus could be used in the government's rebuttal case after Siddiqui testified. Prior to Siddiqui's testimony, the court held a hearing to determine the voluntariness of the statements. At that hearing, the two FBI agents testified,

30

and the district court's ruling credited their testimony. Their testimony established the following.

During the course of her stay at Bagram, Siddiqui was tethered to her bed in soft restraints to prevent her escape.[13] The agents endeavored to meet Siddiqui's needs as best they could and never denied her access to the restroom, food, water, or medical attention. Further, Siddiqui had access to a medical call button that allowed her to contact the hospital's medical staff directly; therefore, she was not entirely dependent on the agents to meet her basic needs. Although Siddiqui was at times in pain and medicated, she was coherent, lucid, and able to carry on a conversation.

Special Agent Angela Sercer spent the most time with Siddiqui. She would arrive in the morning and stay approximately eight hours in Siddiqui's room. Upon arriving, she would ask Siddiqui if she wanted to talk; if Siddiqui indicated she did not, Sercer would remain quietly in the room as a member of Siddiqui's security detail.

---

[13]These soft restraints, made of terry cloth and cotton, provided Siddiqui a fair range of mobility. In fact, the restraints provided such mobility that Siddiqui was able to remove them. After Siddiqui removed the restraints, the agents positioned the straps such that it was impossible to remove the strap on one hand with the other. The restraints were loose enough to allow her to read, drink, and wash, and were removed when Siddiqui required use of the washroom.

Although the topic of the July 18th shooting did come up, Sercer's primary objective was to gather intelligence related to another investigation of Siddiqui commenced years earlier. Siddiqui was generally receptive to speaking with Sercer and indicated that she enjoyed their discussions. Special Agent Bruce Kamerman spent significantly less time with Siddiqui. Although he was not initially tasked with interviewing Siddiqui, supervisors instructed Kamerman to "continue the dialog" when Siddiqui made unsolicited incriminating statements to him. Siddiqui never indicated to Kamerman that she was unwilling to talk. Neither agent gave Siddiqui *Miranda* warnings.

Statements taken from a defendant in violation of *Miranda* may not be introduced by the government during its case in chief. *United States v. Douglas*, 525 F.3d 225, 248 (2d Cir. 2008). But because a defendant "must testify truthfully or suffer the consequences," the government may introduce un-*Mirandized* statements to impeach the defendant's testimony. *Id.* (internal quotation marks omitted). The government cannot, however, introduce a defendant's involuntary statements. *See, e.g.*, *Mincey v. Arizona*, 437 U.S. 385, 397-98 (1978); *see also United States*

32

*v. Khalil*, 214 F.3d 111, 121-22 (2d Cir. 2000). Because Siddiqui testified at trial, the government was free to introduce the statements she made at Bagram Airfield so long as those statements were voluntary.

The government bears the burden of demonstrating that the defendant's statements were voluntary. *See United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010); *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991). To determine whether a defendant's statements were made voluntarily, courts look to the totality of the circumstances surrounding the statements. *Anderson*, 929 F.2d at 99. "Relevant factors . . . include the accused's age, his lack of education or low intelligence, the failure to give *Miranda* warnings, the length of detention, the nature of the interrogation, and any use of physical punishment." *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989). A defendant's mental vulnerability also bears on the analysis. *See Colorado v. Connelly*, 479 U.S. 157, 164 (1986).

A number of decisions have assessed the voluntariness of a defendant's statements where the defendant was in medical distress. For example, in *Mincy*, 437 U.S. at 398-

33

400, the Supreme Court held that a defendant's statements to police were involuntary where the defendant (1) arrived at the hospital a few hours before the interrogation "depressed almost to the point of coma"; (2) suffered "unbearable" pain; (3) was unable to think coherently; (4) was "encumbered by tubes, needles, and [a] breathing apparatus"; (5) expressed his desire that the interrogation cease numerous times to no avail; and (6) was falling in and out of consciousness. By contrast, courts tend to view a hospitalized defendant's statements as voluntary where the defendant was lucid and police conduct was not overbearing. *See Khalil*, 214 F.3d at 121-22; *Pagan v. Keane*, 984 F.2d 61, 63 (2d Cir. 1993); *Campaneria*, 891 F.2d at 1019-20.

We review the factual findings underpinning the district court's voluntariness determination for clear error while subjecting the ultimate conclusion that a defendant's statements were voluntarily to *de novo* review. *See Khalil*, 214 F.3d at 122; *see also United States v. Pettigrew*, 468 F.3d 626, 633 (10th Cir. 2006); *United States v. Bell*, 367 F.3d 452, 460-61 (5th Cir. 2004). Doing so, we find no error in the district court's determination that Siddiqui's statements were voluntary. Although no *Miranda* warnings

34

were given and Siddiqui was kept in soft restraints for the duration of her hospital stay, the agents' conduct was not overbearing or abusive. To the contrary, the agents endeavored to meet her basic needs. Siddiqui conversed freely with the agents, and when she indicated that she did not want to engage in conversation, Special Agent Sercer sat quietly in her room. Further, Siddiqui is highly educated, having earned her undergraduate degree from Massachusetts Institute of Technology and a doctorate from Brandeis University. Most importantly, just as in *Khalil*, *Pagan*, and *Campaneria*, Siddiqui was lucid and able to engage the agents in coherent conversation despite the pain attendant to her injury.

Thus, the district court did not err in allowing the government to introduce the statements Siddiqui made while recuperating at Bagram Airfield to rebut her trial testimony.

**E. Application of the Terrorism Enhancement to Siddiqui's Sentence**

Finally, we address Siddiqui's challenge to the district court's application of the terrorism enhancement under U.S.S.G. § 3A1.4. The enhancement increases by twelve the defendant's offense level and elevates the defendant's

criminal history category to category six if the defendant's offense "is a felony that involved, or was intended to promote, a federal crime of terrorism." *Id.* A "federal crime of terrorism" is an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"; and is a violation of any one of a number of enumerated statutes, including 18 U.S.C. §§ 1114 and 2332. U.S.S.G. § 3A1.4 app. n. 1; 18 U.S.C. § 2332b(g)(5).

The district court found that Siddiqui's offenses were calculated to influence or affect government conduct and that they were calculated to retaliate against government conduct. As to the former, the court determined that Siddiqui's offenses were "calculated to influence or affect by intimidation the government's fulfillment of its official duties including, among other things, the interview team's efforts to interview . . . and . . . detain her." JA 2848. The court, pointing to statements Siddiqui made while in Afghan custody, determined that Siddiqui began scheming to avoid transfer to American custody on July 17, 2008, and that the scheming came to fruition when Siddiqui gained control of the Chief Warrant Officer's rifle and fired at the American interview team.

36

In support of the latter finding, the district court highlighted testimony regarding various anti-American statements Siddiqui made while in custody. In the court's estimation, these statements demonstrated Siddiqui's intent to retaliate against the United States government.

Siddiqui argues that the district court erred in applying the enhancement. She claims that application of both the terrorism enhancement and the Guidelines' official victim enhancement resulted in impermissible double counting. She also contends that her conduct was not "calculated," as required by the plain language of the enhancement. According to Siddiqui, long-term planning is a necessary condition to finding that a defendant's offense was "calculated."

Siddiqui's contention that the district court committed error in applying both the official victim enhancement and the terrorism enhancement is devoid of merit. "[A] district court calculating a Guidelines sentence may apply multiple [enhancements] based on the same underlying conduct," especially where "each of the multiple [enhancements] . . . serves a distinct purpose or represents a discrete harm." *United States v. Maloney*, 406 F.3d 149, 152, 153 (2d Cir.

37

2005).  The terrorism and official victim enhancements both address discrete harms resulting from Siddiqui's conduct–the official victim enhancement "deals with the selection of victims based on their status as government employees," and the terrorism enhancement addresses those acts that are calculated to influence government conduct or to retaliate against a government.  *In re Terrorism Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 153 (2d Cir. 2008).  Accordingly, application of both the terrorism and official victim enhancements does not constitute impermissible double counting. *See id.*

Resolution of Siddiqui's challenge to the district court's finding that her offense was "calculated" merits more discussion.  As previously noted, for the terrorism enhancement to apply, the defendant's offense must be "*calculated* to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  18 U.S.C. § 2332b(g)(5)(A) (emphasis added).  When we interpret the Guidelines, we "giv[e] the words used their common meaning."  *United States v. Stewart*, 590 F.3d 93, 137 (2d Cir. 2009).  "Calculated" means "planned–for whatever reason or motive–to achieve the stated

38

object." *Awan*, 607 F.3d at 317; *see Stewart*, 590 F.3d at 137 ("The conventional meaning of 'calculated' is 'devised with forethought.'").

Many courts (including this one) interpret "calculated" as nearly synonymous with intentional. *See Stewart*, 590 F.3d at 137; *see also United States v. Chandia*, 675 F.3d 329, 333 n.3 (4th Cir. 2012); *United States v. El-Mezain*, 664 F.3d 467, 571 (5th Cir. 2011); *United States v. Jayyousi*, 657 F.3d 1085, 1115 (11th Cir. 2011). Thus, "if a defendant's *purpose* in committing an offense is to 'influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct,'" application of the terrorism enhancement is warranted. *See Stewart*, 590 F.3d at 137 (emphasis added) (quoting 18 U.S.C. § 2332b(g)(5)(A)). Where, however, "there is no evidence that the defendant sought to influence or affect the conduct of the government," the enhancement is inapplicable. *Id.* (internal quotation marks omitted).

Most cases applying the terrorism enhancement have involved conduct that spanned a significantly greater length of time than the conduct here. *See, e.g.*, *Awan*, 607 F.3d at 310-11; *United States v. Salim*, 549 F.3d 67, 70-71 (2d Cir.

39

2008); *In re Terrorist Bombings*, 552 F.3d at 103-05 (2d Cir. 2008); *United States v. Meskini*, 319 F.3d 88, 90-91 (2d Cir. 2003). Relying on this observation, Siddiqui argues that "calculation," as used in the enhancement, incorporates a long-term planning requirement. We disagree. That long-term planning is present in many of the cases applying the terrorism enhancement does not make it a condition necessary to finding that a defendant's offense was calculated to influence government conduct or to retaliate against a government. Instead, the terrorism enhancement is applicable where a defendant acts according to a plan–whether developed over a long period of time or developed in a span of seconds–with the object of influencing government conduct or retaliating against a government.

The day before the shooting incident here, Siddiqui repeatedly implored Afghan police officials not to turn her over to American forces. Siddiqui gained control of an M-4 rifle and fired on the American interview team attempting to take her into United States custody the following day. Under these circumstances, the district court did not

clearly err[14] in its determination that Siddiqui's offense was calculated to influence government conduct–i.e, the United States' attempts to take Siddiqui into custody–by intimidation or coercion.

We also find that the district court did not clearly err in determining that Siddiqui's offense was calculated to retaliate against the United States.  While in Afghan custody prior to the shooting incident, Siddiqui referred to the United States as invaders, and when queried about the bomb-making documents found in her possession, Siddiqui indicated that the target of those bombs were "the foreigners."  *See* JA 3022.  What's more, shortly after firing on the American interview team, Siddiqui stated: "I am going to kill all you Americans. You are going to die by my blood"; "death to America"; and "I will kill all you motherfuckers."  Taken as a whole, this evidence provides a sufficient factual basis for the district court's conclusion that Siddiqui's offense was calculated to retaliate against the United States.

---

[14]We decline Siddiqui's invitation to apply a searching *de novo* review here.  Because the district court's finding on this score is factual, clear error review is appropriate.  *See Salim*, 549 F.3d at 79; *see also El-Mezain*, 664 F.3d at 571.

41

Accordingly, the district court did not err in applying the terrorism enhancement.

### III. CONCLUSION

For the foregoing reasons, and for the reasons provided in the accompanying summary order, Siddiqui's convictions and sentence are hereby affirmed.